## JANE TIMSON v. MANUFACTURERS COAL & COKE COMPANY, Appellant.

**In Banc, May 22, 1909.**

1. **EVIDENCE: Personal Injuries: Master and Servant: Employment Coerced by Miners' Union : Pleading.** In a suit under Sec. 8802, R. S. 1899, to recover damages for injuries received by a miner upon whom rock fell from the roof of a mine, evidence that a miners' union of which the injured miner was a member, dictated whom defendant should employ and whom it should not employ, is not competent, unless some form of duress is pleaded. Evidence of a coerced employment is not admissible under a general denial. Duress is an affirmative defense, and when relied on to defeat a contract of employment, must be specially pleaded.

2. ————: ————: **Coal Mine: Gas-Generating: Judicial Notice.** In a suit under Sec. 8802, R. S. 1899, for personal injuries to a miner caused by the falling of rock from the roof upon him, the defendant mine-owner should be permitted to show that the mine as a matter of fact did not generate gas. The court can-

not, under the statute, take judicial notice that all coal mines generate gas. The Act of April 9, 1895, of which Sec. 8802, R. S. 1899, formed a part, classed coal mines as gas-generating and non-gas-generating, and by the use of the words "all mines generating gas" in said section recognized that there were coal mines which did not generate gas of a kind and character and in a quantity dangerous to the health and safety of the miners. [Disapproving Poor v. Watson, 92 Mo. App. 89.]

Held, by VALLIANT, C. J., dissenting, with whom LAMM, J., concurs, that courts should take judicial notice that all coal mines generate gas; that the statutes do not classify coal mines into gas-generating and non-gas-generating mines; that it was not necessary for plaintiff to either allege or prove that the mine in question generated gas; and that the court did not err in refusing to permit defendant to prove that the mine in question did not generate gas.

3. ——: ——: ——: ——: Pleading: Proof. No cause of action for damages for personal injuries received by a coal miner is stated under Sec. 8802, R. S. 1899, unless the petition contains an allegation that the particular mine in question was a mine generating gas; nor can a case be made out without proof of that fact.

Held, by VALLIANT, C. J. dissenting, that it was not necessary for plaintiff to either charge or prove that the coal mine generated gas; but the court should take judicial notice that all coal mines generate gas.

4. ——: ——: ——: ——: By Nature: Judicial Notice. Aside from the fact that the Legislature has classified coal mines into gas-generating and non-gas-generating, they are so classified by nature. By gas-generating is meant the generating of gas of such kind and in such quantity as will imperil the life, limb or health of the miner, and whether or not it is gas-generating depends upon the mine's depth, the amount of dry fine dust or decaying organic matter permitted to accumulate, its condition as to dampness, the character of coal, and other factors, or the gas may enter through fissures in the floor. In neither case can the court take judicial notice that there was gas in the mine.

Held, by VALLIANT, C. J., that the court should take judicial notice that all deep underground coal mines generate gas.

5. STATUTORY CONSTRUCTION: Original Act: Carried Into Revised Statutes. To get the real legislative intent of a statute carried without revision into the Revised Statutes resort must be had to the original act of which it formed a part, and it must be read in connection with its context. So that to know the meaning of Sec. 8802, R. S. 1899, which does not refer specifically to coal mines, resort must be had to the Act of April 9, 1895, of which it was a part, and that act shows that all its sections relate to coal mines.

6. **JUDICIAL NOTICE: Rebuttable: Evidence.** It is only of matters of common knowledge of which courts take judicial notice, or scientific facts which universal experience has reduced to common knowledge. But facts judicially noticed are disputable. Unless disputed they may be held to make out a prima-facie case; but judicial notice is but a rule of evidence, and, like many other presumptions entertained by courts, the facts of which judicial cognizance is taken may be disputed, and evidence disputing them is competent and should be admitted. So that if there is any question about the right of the court to take judicial notice that the mine in question generated gas, the defendant had the right to offer evidence to show that the mine did not generate gas.

    *Held*, by VALLIANT, C. J., that the court did not err in refusing to permit defendant to show that the mine did not generate gas.

7. **EVIDENCE: Experienced Miner: Opinion.** It is not error to permit an experienced miner to testify that in his opinion, from his knowledge and experience with mine roofs, the roof of the mine was not safe without being timbered. Especially should that be the ruling if, from the conditions existing as he testified them to be, there could be no other answer; for then, whether he was a scientific expert or not, the danger was present and the answer was useless.

8. **VERDICT: Returned Under Abandoned Count: Corrected.** Plaintiff sued in his first count under the special Miners' Damage Act, which fixed the amount of recovery at not more than $10,000, and in his second count under the general Damage Act, which allowed only $5,000 in case of recovery. The second count was abandoned, and the case was submitted to the jury under the first count only, and they returned this verdict: "We, the jury, find for the plaintiff on the second count and assess her damages at $7,000." *Held*, that the word "second" instead of "first" in the verdict was a clerical error, and the court might properly have directed the jury to correct it in its presence, but committed no error in orally directing them to return to their room and find a verdict on the first count, if at all; and when they returned a verdict for $7,000 under the first count, no harm was done.

9. **INSTRUCTION: Damages: Mortality Tables.** It is not error for the court, in a suit by a widow for damages due to the negligent killing of her husband, to insert in the instruction that if plaintiff's husband was in his forty-fifth year at the time of his death his life expectancy was 24.5 years according to the American Table of Experience. Courts take judicial notice of those tables, and do not commit error in informing the jury what deceased's expectancy was thereunder.

10. ——: **Mine: Inspection.** Even though it be conceded that an inspection at any hour of the day prior to the accident would have exculpated the defendant, yet where there was really no evidence that there had been any inspection prior to the accident, the court did not err in instructing the jury, in the language of the statute, that it was the duty of defendant to have had the mine inspected every morning before the men were permitted to enter.

11. ——: ——: ——: **Unsafe Roof, Etc.** Where the statute not only required the mine to be inspected every morning, but also said that "no person shall be allowed to enter the mine until the examiner shall have reported all the conditions safe for beginning work," and there is a conflict in the evidence as to whether there had been an inspection, in that conflict the fact that the rock in the roof was crumbling and falling and that there was no timbering to protect it becomes a material consideration in weighing the evidence, and the court does not err in refusing instructions to the effect that the question as to whether rocks or slate had fallen from the roof in the entryway of the mine at various times before the accident, and the question of whether the entryway should have been timbered, were immaterial and therefore withdrawn from the jury. The plaintiff's case does not rest solely upon the allegation that the mine was not inspected as the statute requires.

Appeal from Clark Circuit Court.—*Hon. Chas. D. Stewart,* Judge.

REVERSED AND REMANDED.

*Campbell & Ellison* and *Percy Werner* for appellant.

(1) The court erred in admitting the opinions or conclusions of certain witnesses that the mine in question was dangerous. Miller v. Canton, 112 Mo. App. 322; Spaulding v. Edina, 112 Mo. App. 69; Morgan v. Hager & Sons Mfg. Co., 120 Mo. App. 609; Hurst v. Railroad, 163 Mo. 320; Keyes-Marshall L. Co. v. Railroad, 105 Mo. App. 560. (2) The court erred in excluding evidence as to the control of the operations of defendant's mine by the local miners' union. Farmer v. Kearney, 115 La. Ann. 722 (39 So. 967); Benn v. Pritchett, 163 Mo. 560; Walls v. Adams,

88 Mo. App. 215; Tandy v. Live Stock Co., 113 Mo. App. 421; Lappin v. Crawford, 186 Mo. 462; Lingenfelder v. Wainwright B. Co., 103 Mo. 578. (3) The court erred in excluding evidence tending to show that the mine in question did not generate gas. R. S. 1899, sec. 8802; McKinnin v. Coal & M. Co., 120 Mo. App. 161. (4) The court erred in instructing the jury orally, after they had returned a verdict on the second count, to return their verdict if for plaintiff, on the first count. McPeak v. Railroad, 128 Mo. 617; State v. Potter, 125 Mo. App. 473; Chouteau v. Jupiter, 94 Mo. 402; State v. Nelson, 181 Mo. 344. (5) The court erred in refusing to give to the jury defendant's instructions 4 and 5.

*William Frank, Higbee & Mills* and *Whiteside & Yant* for respondent.

(1) (a) Complaint is made of the admission of opinions of experienced coal miners that the roof of the entry was not in a safe condition without timbering. The witnesses had some special knowledge not within the experience of all men of common education moving in the ordinary walks of life. Their opinions were based upon their peculiar pursuit and experience. The witnesses stated the facts upon which their opinions were based. Buckallew v. Railroad, 107 Mo. App. 586; 6 Thomp., Neg., secs. 7749-7753, pp. 686-692; Estey Organ Co. v. Lehman, 7 L. R. A. (N. S.) 254. No precise degree of knowledge is required to give expert testimony. The court's ruling will not be reversed except for plain error. Coal Company v. Wells, 61 N. E. 239. (b) But the evidence of negligence in failing to inspect, and maintaining the roof in a dangerous condition for so long a time, is so clear that if the opinion of the miners was inadmissible, the error was not prejudicial. Hurst v. Railroad, 163 Mo. 321; Benjamin v. Railroad, 133 Mo. 289; Fisher v.

Company, 156 Mo. 495. (2) Defendant offered to prove that no laborer or inspector under the rules could enter the mines before 6:50 a. m. The complaint is that this could not be done under the rules. The rules would speak for themselves; and they were neither offered in evidence nor put in the record. But this evidence was irrelevant to any issue tendered by the pleadings. The answer averred Timson was engaged in mining coal in defendant's mine and assumed the hazards. This plea is meaningless unless the relation of master and servant existed. It is not averred in the answer that the miners' union ousted the defendant or took charge of and operated the mine. In this state of the record, and with the evidence of the superintendent and pit boss that they regularly inspected the mine and that Fred Robb's duties were to clean up loose rocks and timber entries and lay tracks, is not this contention of appellant absurd? Is there any ground left for the pretense of duress, if it had been pleaded? Or that the local union, like a band of highwaymen, usurped and controlled the mine, and prevented proper inspection before the miners went to work? On the ground of common knowledge, courts take judicial notice of the general course of business, in the multitudinous occupation of men, including mining. 16 Cyc. 876 (18). This court will take judicial notice that there are miners' unions, and operators' unions, and that they conjointly adopt scale of wages and rules for the operation of mines. The operators, as well as miners, are confederated for mutual protection. It may be, in a sense, commercial war, but it is in no sense duress. Each side strives for terms and the strife is often strenuous. "It is a condition and not a theory." And this is what the rules would have shown if appellant had cared to have put them in the record. (3) It is argued by appellant there is no allegation in either count of the petition of a failure to furnish timbers. It was defendant's

duty to timber the roof of this entry. Defendant had accepted and laid its tracks in this entry. It was a roadway to the miners' rooms and defendant had its day men employed to do the timbering. It was not Timson's duty to timber or inspect this entry. He had a right to work in it unless it was glaringly dangerous. Garrard v. Company, 207 Mo. 242; Hanley v. Company, 47 L. R. A. 597; Coal Co. v. Smith, 55 L. R. A. 99, 65 Ohio St. 70; Hamman v. Co., 156 Mo. 232; McDaniels v. Co., 110 Mo. App. 711; Coal Co. v. Wells, 61 N. E. 236. Extraordinary care is required of the mine-owner. But this question cannot be raised in this case; it is not tendered by the pleadings. It was defendant's duty to furnish Timson a reasonably safe place in which to work, both under the statute (sec. 822) and at common law. 20 Am. and Eng. Ency. Law (2 Ed.), 58; Deweese v. Co., 54 Mo. App. 476, 128 Mo. 423; Cushman v. Fuel Co., 116 Iowa 618, 88 N. W. 817. (4) There was gross negligence in failing to inspect the roof of this entry according to all the evidence. Fisher v. Co., 156 Mo. 490. (5) The dangerous conditions in the roof proven by defendant caused by shot-firing made a daily morning examination necessary as a matter of law, as well as under the statute. The roof was not of solid rock and should have been timbered. Thomas said the roof was bastard slate and had lime in it, which disintegrated. This entry was sixty feet under the ground. The enormous pressure would cause the roof to cave in. The method adopted of firing off heavy charges of blasting powder every afternoon, necessarily loosened rocks in the roofs. Eddy v. Mining Co. (Mich.), 46 N. W. 17; 4 Thomp. on Neg., sec. 4215, n. 147; Sweizel v. Iron Co., 74 N. W. 488; Wilson v. Coal Co., 81 S. W. 278; 26 Cyc. 1140, 1152, 1153; Zellars v. Co., 92 Mo. App. 125. (6) The court did not err in excluding evidence tending to show that the mine did not generate gas. Courts will take judicial notice that coal mines gene-

rate gas. R. S. 1899, secs. 8801, 8802, 8803; Poor v. Watson, 92 Mo. App. 89, 16 Cyc. 856 (10); McKinnon v. Co., 96 S. W. 485; 17 Am. and Eng. Ency. Law (2 Ed.), 895. And evidence will not be heard to the contrary. Ib. 902; State v. Hays, 78 Mo. 318; Borden v. Fauck Co., 97 Mo. App. 569; Garth v. Caldwell, 72 Mo. 622; Jamison v. Co., 12 L. R. A. 652. (7) The court did not err in instructing the jury orally to amend their verdict so as to read upon the first instead of the second count of the petition. Hary v. Speer, 120 Mo. App. 561; Versteeg v. Paint Co., 106 Mo. App. 257; Spring Co. v. Tool Co., 103 Mo. App. 109; Kreibohm v. Yancy, 154 Mo. 67; 22 Ency. Pl. and Pr., 964, 967; Hoyle v. Farquharson, 80 Mo. 378; Cattell v. Company, 88 Mo. 359; Hartman v. Railroad, 48 Mo. App. 619. (8) There was no error in the instructions given for plaintiff. The first instruction was clearly authorized by the evidence. Poor v. Watson, 92 Mo. 89; Fisher v. Co., 156 Mo. 490; Hamman v. Coal Co., 156 Mo. 232. There was no error in the second instruction. McDaniels v. Co., 110 Mo. App. 711. There was no error in the third instruction. Courts will take judicial notice of the average duration of life as indicated by mortality tables showing the natural expectancy of life at a given age. Boettger v. Iron Co., 136 Mo. 536; Young v. Oil Co., 185 Mo. 653; 16 Cyc. 71. The court properly instructed as to the measure of damages. Lee v. Railroad, 195 Mo. 428; Jones v. Railroad, 178 Mo. 552.

GRAVES, J.—Plaintiff is the widow of George Timson, deceased, who was a coal miner in the employ of defendant in its coal mine at or near Connelsville, Missouri. In this mine were employed a large number of men. Deceased came to his death by a rock falling from the roof of the mine upon him. The date of the accident was July 19, 1905.

The petition was in two counts, the first being bottomed upon sections 8802 and 8820, Revised Statutes 1899, and the second under sections 2865 and 2866, Revised Statutes 1899. The second count need not be considered here, as the recovery was had under the first count. Section 8802 is the foundation of the action in the first count, and following the tenor of the statute the petition charges "that it became and was the duty of the defendant to have said mine examined every morning by a practical and duly authorized agent of defendant to determine whether there were any obstructions to roadways and entries or any other dangerous conditions in said mine, and not to permit any one to enter said mine until the examiner should report all the conditions safe for beginning work," and then in appropriate language avers a failure upon the part of the defendant to perform the duty thus required by the statute, and that by such neglect of duty the deceased came to his death, and prayed for damages in the sum of ten thousand dollars.

The answer was a general denial, to which was coupled a plea of assumption of risk.

The petition does not aver that the coal mine in question was a mine in which gas was generated, but said first count is a clear attempt to state a cause of action under the statute, supra.

For the purpose of this opinion, in the view we take of the law, full details of the evidence is not required. Verdict and judgment was for plaintiff in the sum of $7,000 and from this judgment, after a timely but futile motion for a new trial, the defendant appealed.

Plaintiff offered no proof of the fact that the mine in question generated gas. Otherwise the proof offered by plaintiff tended to show a failure upon the part of the defendant to perform the duties required of it by this statute, and that the death of the deceased was occasioned by such failure. It will not be nec-

essary to advert to defendant's evidence further than it bears upon disputed questions of law here. This evidence will be noted in the course of the opinion when discussing such disputed questions.

I.   Upon the cross-examination of some of the witnesses for the plaintiff the defendant sought to elicit the fact that the miners' union of which deceased was a member dominated the business of the defendant in the employment of men to operate its mine. The plaintiff objected to the introduction of this evidence upon the ground that no such issue was tendered by the pleadings, and this objection was by the court sustained. After this defendant offered to prove that said miners' union, of which deceased was a member, dictated to defendant whom it should employ and whom it should not employ; what wages it should pay; what hours the men should work; that without the consent of such miners' union the defendant did not dare to discharge an employee or employ a man; that the men (including deceased) in the mine of defendant were virtually employed by this union of which deceased was a member, and for that reason deceased was not in law or fact in the employ of defendant when killed. This offer of proof was rejected for the same reason by the court, and all this is urged as error by defendant.

Under the pleadings there was no error in this action of the court. If it was the purpose of the defendant to show that by some species of duress it had been forced to employ the deceased, and that the deceased, individually or by and through his fellow members of the miners' union, had coerced his employment, then this question should have been raised by appropriate pleading. If the employment was not made by the defendant voluntarily, but by duress, and the defendant seeks to avail itself of such matter, it should have raised it upon proper plea. A general

denial is not sufficient to raise this kind of an issue. Duress when relied upon to defeat a contract is an affirmative defense, and must be specially pleaded. [7 Ency. Plead. & Prac., 247; Pomeroy's Code Pleading (4 Ed.), 990; Chitty on Pleading (16 Ed.), 511; Richardson v. Hittle, 31 Ind. 119; Ins. Co. v. McCormick, 45 Cal. 580; Lord v. Lindsay, 18 Hun (N. Y.) 484.]

So too, we take it, that if the defendant relies upon the fact that the relationship of master and servant had been created by duress, the same rule of pleading would apply. As to whether or not this pleading and this proof would be a proper defense to the action, we are not now called upon to determine. It is sufficient to say that in the present shape of the pleadings there can be no question as to the correctness of the ruling. The other exceedingly interesting question we reserve for a time when it becomes a live issue in a concrete case.

II.    By questions to witnesses and otherwise in the course of the trial the defendant tried to prove that the mine in question did not, as a matter of fact, generate gas. This evidence was rejected by the trial court on the ground that the court would take judicial notice or cognizance of the fact that all coal mines generate gas. In this position the court was in error, but was evidently lead into such error by the holding of the Kansas City Court of Appeals in the case of Poor v. Watson, 92 Mo. App. 89. This opinion is wrong and is overruled. It is wrong for several reasons: First, the section of the statutes under which this suit was instituted contemplates that as to gases there are two classes of coal mines, i. e., gas-generating mines and non-gas-generating mines. The term gas as used here means such gas as renders the mine dangerous to the health and limb of the miner, and further such quantities as to make it dangerous. To get

at the meaning of the Legislature we must get at the context of the law passed at the time, as well as the previous legislative enactment upon the subject. Section 8802, whilst not specifically mentioning coal mines, had its origin in the Act of April 9, 1895. [Laws 1895, pp. 228 and 229.] It there appears as section 7064a. In this act there are six sections, numbered respectively 7064, 7064a, 7064b, 7064c, 7064d, and 7064e, which were carried into the Revised Statutes of 1899 as sections 8801 to 8806, inclusive. Of this act four out of the six sections speak of coal mines in terms, and the last section (now Sec. 8806, R. S. 1899), reads:

"Every owner, agent or operator of any coal mine. in this State, employing five or more persons, violating any of the provisions of sections 8801 to 8805, inclusive, shall be deemed guilty of a misdemeanor, and on conviction shall be fined for each offense not less than fifty or more than two hundred dollars, or by imprisonment in the county jail not less than three nor more than twelve months, or by both such fine and imprisonment."

The last section of the act shows conclusively that the Legislature was legislating as to coal mines and coal mines only. This is so because when it came to penalizing violations of the sections, including the section under consideration, the Legislature mentions operators of coal mines and none others.

If the section relates solely to coal mines then why use the words "all mines generating gas" in section 8802 if the Legislature did not recognize that there were some coal mines which did not generate gas? Neither article of chapter 133, Revised Statutes 1899, came into our statutes by way of a revised bill, and to get the real legislative intent we must go to the context of the act of which the section formed a part at the time of the enactment. [Paddock v. Railroad, 155 Mo. 524.]

But even had there been a revised bill passed, yet under section 4189, Revised Statutes 1899, these sections would have continued and remained separate laws. Said section reads: "All acts of a general nature revised and amended and re-enacted at the present session of the General Assembly, so soon as such acts shall take effect, shall be taken and construed as repealing all prior laws relating to the same subject, but the provisions of the Revised Statutes, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments." This section is identical in language with section 6606, Revised Statutes 1889, and in the Paddock case, supra, in discussing section 6606, supra, this court said: "Sections 2590 and 2591, as also sections 2593 to 2597, inclusive, of the Revised Statutes 1889, as above shown, are exactly the same as the laws of March 31st and March 23d, respectively, and therefore those sections must be treated, under this legislative direction, as mere continuations of those laws and not as new enactments. They were entirely different laws before and they continued to be different notwithstanding they were carried into the Revised Statutes and placed in the same article of the same chapter of the Revised Statutes, and notwithstanding that they may appear in the bill enacted by the Thirty-fifth General Assembly which revised chapter 42. This has been the uniform ruling of this court on this question. [St. Louis v. Alexander, 23 Mo. 483; City of Cape Girardeau v. Riley, 52 Mo. loc. cit. 428; State ex rel. Atty.-Genl. v. Heidorn, 74 Mo. 410; Pool v. Brown, 98 Mo. loc. cit. 680.]"

So that we find the Act of 1895, of which the present section 8802 was a part, related solely to coal mines, and if so the Legislature evidently classed coal mines as gas-generating and non-gas-generating mines, for if not why put the section in its present form? Had the Legislature known, as counsel

would have us say, , that all coal mines generated gas, it would have simply provided for the inspection of all mines or all coal mines, without undertaking to create a class of coal mines by use of the words "all mines generating gas." The use of these words in the connection therein used shows that the lawmaking branch recognized that there were coal mines which did not generate gas of a kind and character and in quantity to make it dangerous to the health and safety of the miners. The Act of 1895 cannot be read without the conclusion being drawn that each section therein has reference to coal mines and coal mines only.

The act itself having in effect divided coal mines into gas-generating mines and non-gas-generating mines, no cause of action is stated under section 8802, without an allegation that the particular mine in question was a mine generating gas. Nor could a case be made without proof of that fact.

And, secondly, aside from the fact that the Legislature has classified coal mines, as above indicated, they are likewise classified by nature.

Whether a mine is gas-generating is dependent upon many circumstances. By "gas-generating" we mean the generating of gas of such kind and in such quantity as will imperil either life, limb or health of the miner, for such we take to be the legislative meaning. The depth of the mine is a factor. Whether a wet or dry mine is a factor. The character of the coal contained in the mine is a factor. (See Vol. 6, p. 72, Encyclopedia Brittanica, as to gas-producing character of different kinds of coal.) Conditions produced in the working of a mine may be a factor, as when large amounts of dry fine dust are allowed to accumulate, or decaying organic matter is permitted to remain in the mine. The dangerous gases appear in some mines and not in others.

220 Sup—38

In McKinnon v. Coal & Mining Co., 120 Mo. App. l. c. 161, it is said: "It stands admitted that the mine in question did not generate gas."

But under the ruling of Poor v. Watson, supra, if we were trying a case from that mine in Barton county, we would take judicial notice of a fact which did not exist. In volume 4 of the Encyclopedia Americana, under the head of Coal Mining, we find: "The principal gases found in coal mines are carbon dioxide, $Co_2$, heavier than air, suffocating but not inflammable, called choke-damp by miners; carbon monoxide, CO, about as heavy as air, poisonous and inflammable, but easily detected by its odor. Of these gases, marsh gas, given off in large quantities in some mines, is the chief agent in coal mine explosions. A mine is said to be fiery when the coal seems to fire off much fire-damp. Many of the deeper coal mines of Great Britain, France, and Germany, are very fiery. The most fiery mines in the United States are in the anthracite region of Pennsylvania, the South Wilkes-Barre shaft at Wilkes-Barre being one of the most fiery mines in the world. A mixture of marsh, gas and air in certain portions explodes violently on contact with flame. Coal dust in the air makes a much smaller proportion of marsh gas an explosive mixture."

In the Twelfth Annual Report of our State Mine Inspectors (1898) we find an extended discussion of gases in mines. On page 29, it is said: "No coal mine is absolutely free from gas, although all mines do not give off the same kind of gas; one mine will discharge carbonic acid gas (called by the miners 'black-damp'), while another mine in which a large amount of powder is used, or when spontaneous combustion occurs, resulting from the gobs taking fire and generating carbonic oxide or white gas; still other mines give off a carburetted hydrogen gas, which is known to the miners as 'fire-damp.' All of the gases encountered in coal mines are evolved from the coal and its as-

sociated strata, and the prime object in modern mine ventilation is to remove the gas by air currents, or so dilute it as to render it harmless."

It will be observed that different mines produce different gases, and this is due, as will be seen by reading the article, from different causes or conditions. The gas most generally found in coal mines is carbonic acid gas, or in the miners' vernacular "black-damp." Of this the writer on page 31, says: "Black-damp is a non-supporter of combustion, it is invisible, incombustible, odorless and colorless, unfit for respiration, and a positive poison, and is produced in mines by the decaying of organic matter, by burning of lights, by the respiration and perspiration of men and animals, and in connection with carbonic oxide from the combustion of all substances containing carbon, and sometimes it enters in large quantites from fissures in the floor, roof and sides of the mine."

It thus appears that this gas may come from two sources. If it comes from the first mentioned in the article above quoted, the generation thereof and the amount thereof can be regulated or prevented entirely by keeping the mine in proper condition, viz., by keeping out decaying organic matter, and by proper ventilation removing the conditions produced by burning lights, respiration by men and animals. But if it enters through fissures in the floor, roof or sides of the mine, and is not produced by the conditions first aforesaid we would have a mine actually generating gas, which could only be regulated by good and strong air circulation. Of inflammable gases we are informed that only two counties in the State (Bates and Linn) have mines which produce such. Upon investigation, I find that officers having charge of the enforcement of our mining statutes, i.e., the State Mine Inspectors, have always construed section 8802 to apply to mines generating inflammable gases and not otherwise.

But take the mine in question, how can we take judicial knowledge of the fact that it produces gas of any particular kind, and was so producing it at the date of the accident? So far as we know there might have been no fissures in the floor, walls and sides giving forth gas, because all mines do not have such, and it may have been so cleared of rubbish and other matter by proper ventilation and otherwise, as not to produce gas from the other sources.

In an early work, entitled, "Coal, Iron & Oil," by Daddow and Bannan, at page 304, it is said: "As no gases are liberated in working the coal, the means of ventilation are simple. The main object kept in view is to conduct a sufficient supply of pure air through the mine in order to displace the vitiated air where the miners are at work. This is accomplished by natural means, the currents of air being produced by the difference of density between the air of the mine and that of the atmosphere, motion being communicated by the difference in altitude between the mine-shaft and the mouth of the adit or gangway."

But beyond all it is not a matter of common knowledge that gas of some kind is generated in deleterious quantities in all coal mines, and it is only of matters of common knowledge that we take judicial cognizance. To this should be added scientific facts which universal experience has reduced to common knowledge.

As said in 16 Cyc. 852: "Courts may properly take judicial notice of facts that may be regarded as forming part of the common knowledge of every person of ordinary understanding and intelligence; but not of facts merely because they may be ascertained by reference to dictionaries, encyclopedias, or other publications; nor of facts which the court cannot know without resort to expert testimony or other proof."

The case of Poor v. Watson, 92 Mo. App. 89, relied upon by my brother, is wrong and should be

overruled in terms upon this point. The cases cited and relied upon by the learned judge writing the opinion in that case do not go to the extent of his opinion. In every case cited the thing judicially noticed is a thing of common knowledge. It may be that all experienced coal miners have a peculiar knowledge of the gas-generating proclivities of coal mines, but we cannot go so far as to hold that it is so universally known and a matter of such common knowledge as to make it a subject of judicial cognizance.

III. When testimony was offered to show that the mine did not generate gas at the time of the accident, the objection made was, "Because the law presumes all coal mines to some extent to generate gas." This objection was sustained. This was error. If there is any question about the matter of taking judicial notice of a fact the doubt should be solved against the assumption of such fact and the parties put upon their proof. A very learned author, with much reason, as we see it, goes to the extent of saying that even where the court permits one side to rely upon judicial notice, yet this does not preclude the opposite party from disputing the fact so noticed if it be disputable.

As said by Justice SWAYNE in speaking of judicial cognizance in Brown v. Piper, 91 U. S. 1. c. 42-43: "This power is to be exercised by courts with caution. Care must be taken that the requisite notoriety exists. Every reasonable doubt upon the subject should be resolved promptly in the negative."

And in 7 Encyclopedia of Evidence, p. 892, it is said: "It has been said that courts should refuse to exercise the function of judicial notice where there is any reasonable doubt of its propriety."

In this case, the doubt should have been resolved in favor of defendant and it permitted to have introduced this evidence.

On this question, 4 Wigmore on Evidence, sec. 2567, says: "That a matter is judicially noticed means merely that it is taken as true without the offering of evidence by the party who should ordinarily have done so. But the *opponent is not prevented from disputing* the matter by evidence, if he believes it disputable. It is true that occasionally a court is found declaring a thing judicially noticed and at the same time refusing to listen to evidence to the contrary; but usually this is in truth laying down a new rule of substantive law by declaring certain facts immaterial; whenever a court forbids the production of evidence, it removes the subject from the realm of the law of evidence properly so called."

The fact that courts in the first place, and as making out a prima-facie case, will take judicial notice of certain things, does not preclude the opposite party from rebutting such prima-facie case, and if the facts judicially noticed are disputable, then the party is not and should not be prevented from disputing them, if in fact he can do so. Judicially noticing facts, like many presumptions entertained by the courts, is but a rule of evidence, and if the question is a disputable one, or can be disputed, evidence so disputing it is competent and should be admitted. This is the rule laid down by Wigmore and other authorities and is well founded in reason. [4 Wigmore on Evidence, sec. 2567 et seq.]

The questions as to the instructions need not be discussed. They were given upon the erroneous theory which pervaded the whole case and can be shaped to accord with these views upon a new trial. The petition, as stated, attempts to state a cause of action under section 8802, but is defective in not charging that the mine in question generated gas. Plaintiff failed to make a case without such proof owing to such erroneous theory. The cause should be and is reversed and remanded that plaintiff may take such

further steps as she desires in harmony with the views herein expressed.

*Gantt, Burgess* and *Fox, JJ.*, concur; *Woodson, J.*, concurs, but is of opinion that the defense of duress attempted to be injected in the case by the evidence offered, is no defense to the action, although it had been properly pleaded, and that we should so say at this time. *Valliant, C. J.*, who wrote the principal opinion in division, files his opinion there written, as a dissenting opinion here. In this opinion of *Valliant, C. J., Lamm, J.*, concurs in all except that portion wherein it is intimated that the evidence offered on the question of the alleged duress would be proper.

## DISSENTING OPINION.

VALLIANT, C. J.—I do not concur in the majority opinion for the reasons fully set out in my opinion filed in Division One of this court, which opinion I file herewith as my dissenting opinion here. *Lamm, J.*, concurs with my views, with the exception of the portion of the opinion wherein it is indicated that the evidence tending to prove duress would have been admissible under proper pleadings.

Defendant owned and operated a coal mine in Adair county, in which it employed a large number of miners, among whom was the plaintiff's husband, who, while in defendant's service as a coal miner, on July 19, 1905, was killed by the falling of a stone on him from the roof of the mine.

The petition is in two counts. The first is under sections 8802 and 8820, Revised Statutes 1899, Ann. Stat. 1906, pp. 4084 and 4096; the second is under sections 2865 and 2866, Revised Statutes 1899, Ann. Stat. 1906, pp. 1644 and 1646. Section 8802 makes it the duty of operators of mines generating gas to have

them inspected every morning before the miners are admitted into the mines, and section 8820 gives a right of action for failure to perform that duty to the person injured, or in case of his death, to his widow or other defendants therein named. In the first count it is alleged "that it became and was the duty of the defendant [using the language of the statute] to have said mine examined every morning by a practical and duly authorized agent of defendant to determine whether there were any obstructions to roadways and entries or any other dangerous conditions in said mine, and not to permit any one to enter said mine until the examiner should report all of the conditions safe for beginning work." Then it is alleged that the defendant did not have the mine examined that morning or at any time within three months prior thereto, but suffered plaintiff's husband and other employees to enter, etc.; that for a week or more there had been in the roof of the mine overhanging rocks, slate and dirt, loose and liable to fall and injure or kill defendant's employees; that it was so dangerous that if it had been examined by a competent person within a week the danger would have been discovered.

As the recovery was on the first count it is not necessary to discuss the second.

The answer stated that the plaintiff's husband "was engaged in mining coal in defendant's mine near Connelsville, Missouri, and that at that time the said George Timson knew the hazards incident to the work in which he was engaged, and with full knowledge of the conditions and hazards, chose to work at the time and place stated in the petition and therefore assumed all the risks and hazards incident to the work in which he was engaged, and that his death was occasioned by and was incident to the hazards of the performance of the work in which he was engaged. Further answering, denies each and every allegation in said petition contained."

Timson v. Coal & Coke Co.

The testimony on the part of the plaintiff tended to show that the roof of this mine had not been inspected for a month or more prior to the accident; that falling rock from the roof into the roadways of the mine was a frequent occurrence, almost daily; that men were employed, called day men, whose duty it was to go over the roadways every day and remove fallen rock or other obstructions; that the way to examine a roof to see if it is safe is to strike it with a coal pick or some other metal implement and observe the sound, if the sound be what they called drummy the overhead rock was deemed unsafe, if it sounded solid it was safe, in that way if the rock in the roof was unsafe the condition could be discovered; that frequently splinters chipping from a rock like that which caused the death of plaintiff's husband were observed falling, but no cracking sound gave warning, the chipping sound can sometimes be heard quite a distance; there is a class of rock that falls without warning; there is a class of rock that an experienced man could examine and not be able to tell it was going to fall; at the point where the accident occurred the roof was not timbered; that while plaintiff was at work in the usual course of his employment a rock from the roof fell on him and killed him.

One of plaintiff's witnesses, a boy seventeen years old, who was employed as a "day man," whose usual duty was to go over the roadways in the mine and remove fallen rock or other obstructions, testified that he had never before this accident inspected the roof of the mine, but his work was to clear the roadways and do any thing the pit boss ordered. On cross-examination by defendant he was shown a paper signed by him dated July 28, 1905, nine days after the accident, addressed to the superintendent of the mine as follows: "This is to certify that the main south entry at switch near the east entry at spot where Timson accident occurred had been inspected and

found to be safe at 8 o'clock the morning of the accident, July 19, 1905, by the undersigned, Fred Robb, day man.'' On redirect examination he testified that he did not read the paper before signing it, that as a matter of fact he did not sound the roof; ''when I signed that I meant that I had gone over the road and that everything was clear.''

On the part of defendant the testimony tended to prove as follows:

The State Mine Inspector testified that he had inspected this mine in April before the accident, and July 20th, the day after the accident; he did not sound the roof, but some one did in his presence and it sounded solid; he examined the rock that fell and was of the opinion that the rock might have been sounded in the morning and seemed solid yet have fallen out in an instant after. He did not inquire if they had a mine inspector, as he did not require operators at Connelsville to have inspectors.

The superintendent of the mine testified that he usually went over the mine two or three times a week; went over it on the 16th or 17th of July, and found it safe; was there ten or twelve minutes after the accident, and saw the rock which fell; from the nature of the rock it was his opinion that an examination of the rock at 7 o'clock in the morning would not have revealed the fact that it was loose, it might have been inspected at seven and appeared sound, yet have fallen at 10 o'clock.

Defendant's foreman testified that it was his business to go over the mine and he did so every day; he was with Timson a few minutes before the accident and observed nothing to indicate danger; there was no sound of chipping heard; he was also of the opinion that ''a rock like that might be loose for two or three hours, or may be not so long, and it might be loose two or three days before it fell. It is hard to tell; . . . there is no way to detect the presence of that kind

of a rock when sounding it." Neither of those witnesses testified that he inspected or tested the roof.

In the course of the cross-examination of two of plaintiff's witnesses defendant asked some questions indicating a purpose to elicit from them evidence that the miners' union of which plaintiff's husband was a member exerted a domineering influence over the defendant; the questions were objected to on the ground that there was no such issue in the case and the court sustained the objection. Then the court permitted the counsel for defendant to make a somewhat elaborate offer of proof, to the effect that the miners' union dictated to defendant whom it should employ and whom not, what wages it should pay, what hours work, and that without the consent of the union defendant dared not employ or discharge an employee, and that virtually the men in defendant's employ, including plaintiff's husband, were employed by the union; therefore, plaintiff's husband was not in the employ of defendant at the time he was killed. To all of which the plaintiff objected on the ground that there was no such issue in the case; the court sustained the objection.

In the examination of one of its own witnesses, the superintendent, defendant asked this question: "State to the jury whether or not at any time during the year 1905 that part of the mine where Timson was killed generated gas of any kind?" That question was objected to on the ground that the law presumed that all coal mines to some extent generated gas; the objection was sustained.

After refusing an instruction asked by defendant at the close of all the evidence to the effect that the verdict should be for the defendant the case was submitted to the jury on instructions which will be noticed hereinafter.

I.  Did the court err in sustaining plaintiff's objection to defendant's offer of proof relating to the alleged influence of the miners' union?  The objection was on the ground that there was no issue of that kind in the case.  Defendant in its brief contends that by its plea of assumption of risk it tendered the issue that plaintiff's husband assumed the risk incident to the work as it was then and there conducted, and since the "offer to prove" tended to show that it was then and there conducted by defendant under duress of the miners' union, of which plaintiff's husband was one, he assumed the risk of whatever negligence there was in the operation.  Reading that part of the answer gives no hint of such a defense; it is simply a plea that "Timson knew the hazard incident to the work in which he was engaged and with full knowledge of the condition and hazard" chose to engage in it.  The plea conveyed the idea only that the accident was the result of one of the hazards incident to that kind of business.  We have often held that a plea of that kind in an answer containing a general denial was redundant, because the fact pleaded could be proven under the general denial.  Every employee assumes the risk incident to the work in which he engages, and if he is injured as a result of a risk incident to the business he is not injured by the negligence of his master, and therefore proof of that fact disproves the allegation of negligence, and therefore such proof may be made under the general denial.  That plea of assumption of risk is really of no service and adds nothing to the defense contained in the general denial.

Plaintiff's counsel think that the answer admits the employment of Timson by defendant, and perhaps that part of the answer which attempts to plead assumption of risk is liable to that construction, because it says: "he was engaged in mining coal in defendant's mine," etc.; which, being without words of

qualification, would imply that he was in the employ of defendant, and that is probably what the pleader meant, but for the sake of the point now under consideration let us assume that the allegation in the plaintiff's petition that plaintiff's husband was in the employ of defendant is not confessed but is put in issue by the general denial. If, therefore, the defendant was entitled to prove, without specially pleading the fact, that it was not free to conduct its own business, but yielded to a *vis major* in the employment of all the men engaged in working the mine, among them plaintiff's husband, the proof offered would have been competent. Plaintiff's testimony tended to show that her husband was in the service of the defendant. There were two ways for defendant to meet that testimony: first, by direct proof to the contrary; second, by proof to show that although he was employed by defendant yet defendant was forced to employ him, forced to submit to his working in the mine and forced to pay him wages. Of those two ways the first could be taken under the general denial, but could the second? The second is simply an affirmative defense of duress and therefore it requires a special plea. 7 Ency. Pl. & Pr., 247, says: "Duress is not available under the general issue, but must be specially pleaded, and the nature of the duress relied on should be specifically stated." In Pomeroy's Code Rem. (4 Ed.), page 790, it is stated thus: "Akin to the defense of fraud is that of duress; the facts constituting duress must be stated, and a mere general averment will not suffice." This was the rule also at common law. In 1 Chitty on Pleading (16 Ed.), *p. 511, it is said: "The following defenses were always required to be specially pleaded: matters showing that the deed was merely voidable, on account of infancy, or duress, or fraud." And in the following cases it was held not only that the defense of duress must be pleaded but that the facts constituting the duress must be specifically pleaded:

Richardson v. Hittle, 31 Ind. 119; Connecticut L. Ins. Co. v. McCormick, 45 Cal. 580; Lord v. Lindsay, 18 Hun (N. Y.) 484.

If, therefore, the defendant intended to rely on the defense that it was coerced into employing the plaintiff's husband and others and that it could not even employ an inspector without leave of the miners' union, it should have made a special plea to that effect, stating not only that it was coerced, but how, when and by whom. There was no such plea and no issue in the case to which the proof offered related. The court ruled correctly on that point.

II.    There is no allegation in the petition that this mine generated gas, and for that reason defendant insists that it states no cause of action under section 8802. The first sentence of that section is: "All mines generating gas in which men are employed shall be examined every morning by a practical and duly authorized agent of the proprietor, to determine whether there are any dangerous accumulations of gas, or lack of proper ventilation, or obstructions to roadways, or any other dangerous conditions; and no person shall be allowed to enter the mine until the examiner shall have reported all of the conditions safe for beginning work."

The petition alleges that it was an underground coal mine in which the accident occurred. There being neither allegation nor proof that this mine generated gas, the plaintiff's case, in that particular, must rest on the proposition that the court will take judicial cognizance that all coal mines generate gas. The plaintiff is safe in that position, courts will take judicial cognizance of that fact. We find in Poor v. Watson, 92 Mo. App. 89, a discussion of that subject in an opinion by ELLISON, J., which is so clear and convincing that we cannot do better than refer to it and

adopt it as our own view of the law.  That part of the opinion relating to this subject is as follows:

"But plaintiff urges that the statute quoted does not refer to coal mines; that coal mines are not included in the descriptive words 'all mines generating gas.'  In our opinion, the courts should take judicial notice that coal mines generate gas and that therefore the statutory expression, 'all mines generating gas,' includes coal mines.

"Judicial notice should be taken of things which are of general knowledge among people of ordinary information.  They will take judicial notice of recognized scientific facts and principles without the necessity of evidence and may do so of their own motion. [Brown v. Piper, 91 U. S. 37.]  They will take judicial notice that volatile oil subjected to heat will produce gases (Fuchs v. St. Louis, 133 Mo. 168); that coal oil is inflammable (State v. Hayes, 78 Mo. 307); that such an explosive as dynamite is dangerous (Norwalk Gaslight Co. v. Norwalk, 63 Conn. 495); that natural gas is inflammable and explosive (Jamieson v. Gas Co., 128 Ind. 555).  It is now common information that coal mines contain gases which are a menace to health and life and that they are a source of anxiety to the lawmakers as well as to the parties directly concerned, we regard the adjudications just cited as authority for and as illustrative of our holding.

"But aside from the consideration just stated, we think the statute itself shows that coal mines were meant to be included in the statutory expression above quoted.  In other words, the statute clearly recognizes that coal mines generate gases.  Thus, section 8801 provides for certain ventilation and a certain volume of air to be forced and circulated to the face of every working place throughout a coal mine so that such mine shall be free from powder smoke 'and gases of every kind.'  Section 8803 provides that it shall be unlawful for any operator of a coal mine to employ

any but experienced persons under ground whose du-
ties may involve contact with 'inflammable gases.' In
1891, it was decided by the Supreme Court of Kansas
that it was not then sufficiently recognized and con-
ceded by experts and by the books that 'coal dust
was an explosive,' as that judicial notice could be
taken of it. [Coal Co. v. Wilson, 47 Kan. 460.] But
section 8826, of the statute under consideration now,
in effect, declares that dry and dusty coal mines dis-
charge 'carbonated hydrogen gas.' More evidence of
the meaning and contemplation of the statute could
be cited from the language used therein; but it is
sufficient to say that the various rules of protection
for the coal miner, laid down in the different portions
of this statute, and the apparent solicitude of the
Legislature for the welfare of the miner which is
shown throughout the act, disclose a legislative affirma-
tion that coal mines do generate gas, and, hence, we
have no hesitation in holding that the phrase in section
8802, aforesaid, 'all mines generating gas,' includes
coal mines.

"But in additional briefs filed by leave, a posi-
tion is taken not altogether consistent with former
contentions. Plaintiff now concedes that all coal
mines do generate gas, but the point is now earnestly
made that the statutory expression aforesaid, 'all
mines generating gas' means only an explosive gas
called 'fire-damp.' This construction is without rea-
son and it is not only in the face of the words of
the statute, but it is opposed by the history of the
present enactment. The statute, as it now reads,
was enacted in 1895. Prior to that, in the revision
of 1889, section 7064, it read that the mine-owner
should maintain a sufficient amount of ventilation,
'which shall be forced and circulated to the face of
every working place throughout the mine, so that
said mine shall be free from standing gas of what-
soever kind; and in all mines where fire-damp is

generated, every working place where such fire-damp
is known to exist shall be examined every morning
with a safety lamp by a competent person, before
any other persons are allowed to enter.' In 1895, the
statute was changed to its present reading, by omit-
ting the restriction to one kind of gas, and such gen-
eral language as necessarily embraces all noxious gases
whether explosive or not. There are gases suddenly
fatal to the life of the miner which are not known and
designated as 'fire-damp,' while there are others,
which, while not so deadly, are yet ruinous to health;
and the breadth of the language in the present statute
is but the growth of the humane sentiment of protec-
tion which the spirit of the present age has demanded
of the Legislature. When the generality of the lan-
guage of a statute manifestly justifies its application
to all of a number of injurious gases generated in a
mine, why should it be restricted to one of those?

"We are cited to the opinion of mine inspectors
that all coal mines do not generate the particular
gas known as fire-damp; and to their statement that
fire-damp was what they understand the Legislature
to have meant by the statute aforesaid. But we have
already shown that while the statute was once restrict-
ed to that particular gas, the injustice and unreason-
ableness of such restriction was recognized by the
Legislature when that body withdrew the restrictive
words and put in their stead other general words
obviously embracing all gases, the presence of which
would thwart the object of the law, viz., the life and
health of the miner."

Appellant refers to McKinnon v. Coal & M. Co.,
120 Mo. App. 148, as holding a different view, but we
do not so understand that case. The contest there
was over another disputed question, the only reference
to this subject was a statement in the opinion that:

"It stands admitted that the mine in question did not generate gas."

We hold that the petition is not defective because it did not state that this mine generated gas.

III. Defendant complains that it was not permitted to prove that this mine did not generate gas. In this case we have a mine producing material out of which the court must take judicial notice that gases come; the coal is loosened from its natural bed by means of drills into which explosives are placed and fired; the mine sixty feet underground; there are seventy shots fired every evening after the men leave the mine, and the testimony is that these shots loosen the rocks, open the veins, even throw down the timbers, and cause slate and lime and sulphur and other stuff to fall to such an extent that the day men are employed every day in clearing the obstructions out of the roadways—yet defendant contends that it was prepared with proof to show that the mine did not generate gas.

16 Cyc. 850: "Judicial knowledge is not reached by the use of evidence; it is a matter pertaining to the judicial function and its existence, like that of an admission, stipulation, or rule of presumption, dispenses with evidence as to the point covered." And on p. 852: "Uncontroverted evidence produced to establish a fact does not preclude the court from finding the fact to be otherwise by resorting to judicial knowledge."

The court did not err in excluding that evidence.

IV. A witness for plaintiff, Elsea, a miner who had been working in that mine over three years, described the mine, its entries, roadways, rooms, etc., and stated that the only inspection he ever observed was the day men going over the entry ways and clearing up the fallen rock. There were fallings from the roof almost every day, the pieces that fall were some-

times small and sometimes large, he had seen sometimes six or eight car-loads taken out of one entry way at one time, a car would hold about a ton, the falling was more in summer than in other seasons; shortly before Timson was killed there had been a fall from the same roof thirty or forty feet beyond; witness stated that he did not understand the formation of the roof or character of the rock, some called it rock, some called it slate, he did not know which it was; that part of the roof was not timbered. He was asked: "From your knowledge and experience with mine roofs, state whether or not you considered that roof at that time, safe, without being timbered?" Objection by defendant on the ground that 'witness had not shown himself to be an expert and also it was invading the province of the jury—objection overruled—"A. Well I wouldn't think it safe with so many falls happening." That ruling is assigned for error. The witness, though not an expert in the sense of a scientific mine engineer, yet was a miner of experience in the matter of which he was speaking. The falling of stones or other heavy substances was a matter of such frequent occurrence in such work that men working in mines would naturally take vital interest, the instinct of self-preservation would cause them to carefully notice the causes and effects. This witness knew that such things were liable to fall from the roof and he had seen the danger guarded against by timbering. The question and answer were perhaps useless, because if the conditions existed as he testified, there could have been but one answer to the question. If the witness had been asked to state how many men were employed in the mine, and had answered that there were twenty in one place, fifteen in another, and ten in another, and if he had then been asked to state how many there were in all and had answered forty-five, he would doubtless have been invading the province of the jury, but as there could have been

but one rational answer given there was no harm done. So in this question, if it was true as he testified that rocks, slate and other heavy substances were frequently falling and if the usual way to protect men at work under such a roof was to timber it, and if this was not timbered what could any rational man say in answer to the question? Whilst the witness did describe as best he could the conditions from which the conclusion was drawn, and thus gave the jury data from which to draw its own conclusion, yet, even if the conditions were such that two conflicting opinions might be drawn by men not familiar with that kind of surroundings, the opinion of one who was familiar, whose life depended daily on observing those conditions and thus was more competent to form an opinion than one who was not so familiar, his opinion would be competent evidence to go to the jury for what it was worth. At best such opinion evidence is only advisory.

The court did not err in overruling the objection to that question.

In the same category is the objection to the following question to another witness of like character and his answer thereto: "From your knowledge of that mine and the roof, and your experience in mining, I will ask you whether or not that roof in that part of the mine was safe for miners to work in at that time? A. Not without it was timbered?" What we have above said of a like question and answer to the first witness applies to this also.

V. The instructions for the plaintiff submitted the case to the jury on the first count of the petition, that is, the special Miners' Damage Act, sections 8802 and 8820. There was no instruction given relating to the second count which was under the general Damage Act, and the form of the verdict given to the jury by the court, if for the plaintiff, specified the first count

only. Under the Miners' Damage Act the recovery is fixed at not more than $10,000; under the general act it was $5,000. The jury came into court with this verdict: "We, the jury, find for the plaintiff on the second count and assess her damages at $7,000." The court after reading the verdict in the presence of the jury orally directed them to retire to their room and find a verdict for the plaintiff, if at all, on the first count and thereupon the jury retired and returned a verdict for plaintiff on the first count for $7,000. That action of the court is assigned for error.

In the manner in which the case was submitted to the jury the second count was practically eliminated from the case, there was but one count left. If the plaintiff had formally dismissed the cause of action stated in her second count and a judgment of dismissal thereof had been entered, it would have been more formal and better practice, but the merits of the case would not have been different, or the result. Where a petition contained more than one count—but the evidence related to one only and there was a general verdict without specifying on which count it rested, the court upheld the verdict and applied it to the only count to which the evidence referred. [Allen v. Railroad, 84 Mo. 653.]

The naming of the second count in the verdict instead of the first, was only a clerical error which the court had authority to have corrected, the court might with propriety have had the correction made by the jury even without sending them to their room, but certainly there was nothing impairing the rights of either party in sending the jury back to correct its error. [Kreibohm v. Yancey, 154 Mo. 67, l. c. 82-3; Hary v. Speer, 120 Mo. App. 556.]

The court in giving that oral direction to the jury did not violate the statute which requires instructions to the jury to be given in writing.

VI.   The instructions given for the plaintiff are criticised on three grounds: 1st, they ignore the question of defendant's mine being one which generates gas; 2d, they refer to the American Table of Experience in estimating the life expectancy of plaintiff's husband; 3d, they say that it was defendant's duty to have the mine inspected before the men entered.

1.   We have already expressed our views on the subject of the court's taking judicial notice that coal mines generate gas.   It would have been improper if the court had submitted such a question to the jury.

2.   In the third instruction (*inter alia*) the court said that if the jury should find from the evidence that plaintiff's husband was in his forty-fifth year, his life expectation according to the American Table of Experience was 24½ years, but that that statement was only given as a suggestion and not to be taken as binding on the jury.

Common experience teaches that there is nothing forecasting the future more certain than the average expectation of human life as computed by the tables in common use among life insurance companies.   In all classes of life, among intelligent people, those tables are referred to with confidence.   In fact, if we could not refer to them for proof it would be almost impossible, in ordinary affairs of life, to obtain data on which we could calculate one's life expectancy. Courts are bound to take judicial notice of these tables.

In 16 Cyc. 871, it is said: "The law of averages as established by statistics will be recognized by the judge, so that for example he will take notice of the average duration of life as indicated by mortality tables showing the natural expectancy of life at a given age."

The court committed no error in inserting that information in the instruction.

3. The court instructed the jury, in the language of the statute, that it was the duty of the defendant to have had the mine inspected every morning before the men were permitted to enter. Defendant contends that that was error because it would have done just as well if the inspection had been made at any hour in the day before the accident. Even if it should be conceded that there would have been a compliance with the mandate of the statute if the inspection and certification of good condition had been made at any time before the accident, it would be immaterial in this instance, because there was really no evidence that there had been any such inspection before the accident. The certificate on which defendant relies which was signed by the 17-year-old boy, nine days after the accident, is not legal evidence; at most it was only competent to contradict him when he testified that he did not make an inspection of the roof. He did not write the certificate; he testified that he did not read it, but signed it at the request of the superintendent. The certificate does not say that the roof was inspected, and, though somewhat vague, it is really not in conflict with what the witness said he undertsood it to mean, that is, that the roadway was clear. His testimony was unequivocal that his duties were only to clear the roadway of fallen material and do any work the boss ordered him to do, that he never tested the roof. There was no effort made by defendant to prove that this boy was employed as an inspector or was qualified. The defendant's witness, the State Mine Inspector, testified that he did not require defendant to have an inspector, and defendant made no effort to prove that it ever had one; on the contrary it tried the case on the theory that the law requiring inspection did not apply, because the mine did not generate gas. Besides, the court at the request of the defendant gave an instruction embodying the theory of the law defendant now contends for,

that is, if the mine was inspected that morning and reported by the inspector to the pit boss about 8 o'clock (that is, after the men had entered the mine and begun work, but before the accident) that the mine was safe, the verdict should be for the defendant. The jury found against the defendant on that hypothesis.

We find no error in the plaintiff's instructions.

VII. Defendant complains that its instructions 4 and 5 were refused. Those instructions were to the effect that the question as to whether rocks or slate had fallen from the roof in the entryway of the mine at various times before the accident and the question of whether the entry should have been timbered, were immaterial, and all evidence bearing on those questions are withdrawn from the consideration of the jury. The argument is that since the plaintiff's case rests on the allegation that the mine was not inspected as the statute requires, there was no other question of negligence in the case.

The statute requires that the mine be inspected every morning, but it requires more than inspection, it says: "and no person shall be allowed to enter the mine until the examiner shall have reported all of the conditions safe for beginning work." What the law-makers had in mind was that the operator should take that precaution to see that the mine was reasonably safe before the miners were permitted to enter to go to work. Defendant in its brief contends that the mine was inspected and reported safe. The boy on whom it relies to sustain that contention denies that he made any examination of the roof, and the certificate signed by him does not so say, but says that the "main south entry at switch near east entry at spot where Timson accident occurred had been inspected and found safe," etc. Defendant's contention is that that is evidence tending to show that the

roof as well as the roadway was inspected and found safe. As already said we do not think it was legal testimony on that point, but if defendant's contention be correct, then there is a conflict in the evidence as to whether there had been such an inspection, and in that conflict the fact that the rock in the roof was crumbling and falling and that there was no timbering to protect it, is a material consideration in weighing the evidence. Defendant attempted, by way of excuse for not having an inspector, to prove that no inspection would have disclosed the infirmity that caused the rock in this instance to fall, and at its request the court instructed the jury that if "the proximate or original cause of fall of the rock in question was an inherent or latent defect and could not have been discovered by ordinary inspection, then, and in that event, your verdict shall be for the defendant." As this is defendant's appeal the correctness of that instruction is not in question; therefore, by referring to it we do not mean to approve it, but we mention it to note the fact that defendant by that instruction put the question to the jury whether the condition of the rock was such as that its defect could have been discovered by ordinary inspection. What right then did the defendant have to have the jury instructed that in considering that question they should disregard all evidence concerning the falling of rock at various times before the accident? Under the circumstances there was no error in refusing defendant's instructions 4 and 5.

VIII. The questions involved in defendant's last assignment, that the court erred in overruling the motion in arrest of judgment, have already been considered in discussing other assignments.

We find no error in the record. The judgment should be affirmed.