Marjorie (West) **ENGLISH**, Appellant,

**v.**

**OLD AMERICAN INSURANCE COMPANY,**
a Corporation, Respondent.

**No. 52986.**

Supreme Court of Missouri,

Division No. 1.
March 11, 1968.

As Modified on Court's Own Motion and
Rehearing Denied April 10, 1968.

34

George L. Gisler, Kansas City, for appellant; Gisler & Howell, Kansas City, of counsel.

Martin J. Purcell, Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, for respondent.

CHARLES SHANGLER, Special Judge.

On September 25, 1962, defendant Old American Insurance Company insured plaintiff's husband, Albert West, against certain accidental injuries or death suffered while riding in a "private passenger

automobile". Superimposed upon the face of the insurance policy, in block letters, is the legend: "THIS IS A LIMITED POLICY READ IT CAREFULLY." On September 14, 1963, Mr. West, returning home from work in his 1962 Chevrolet pick-up, collided with a tractor-trailer, was injured and died of those injuries on October 2, 1963.

In due course, the plaintiff beneficiary made claim for payment and was refused. Defendant refused payment and defended the action brought on the policy on the ground that the half ton pickup was not a "private passenger automobile" within the context of the policy. That term was defined in the policy as follows:

" * * * As used in this Policy, *automobile* means a land vehicle of the type commonly and ordinarily known and referred to as an 'automobile', and *private passenger automobile* means a private *automobile* designed primarily for transporting persons."

A jury returned a verdict in favor of plaintiff in the amount of $15,000 plus interest of $750. The trial court sustained defendant's after trial Motion for Judgment and entered judgment for defendant. Although defendant asserted four grounds in its Motion for Judgment, actually but two points are raised in it. Firstly, that the terms of the insurance contract between Mr. West and defendant were unambiguous, excluding, as a matter of law, the half ton pickup from its definition of "private passenger automobile". Secondly, that the plaintiff failed to make a submissible case.

Plaintiff, on the other hand, offers five distinct grounds of error. As we will detail, they, too, can be reduced to merely two grounds, the others being either redundant or tangential. As asserted, however, the five are rendered verbatim:

"1. The design, construction and use of one half ton pick ups is (sic) primarily for passenger transportation.

"2. The words 'designed' and 'primarily' as used in the policy are ambiguous and that ambiguity should be resolved in favor of the insured. 'Designed primarily' means the principal use of the vehicle made by the insured.

"3. The cases uniformly hold that a pick up is a 'private passenger automobile'.

"4. Where a vehicle has more than one purpose or design it is a question of fact for the jury to determine which use is 'primary'. The verdict of the jury in this case, which was supported by overwhelming evidence should be restored.

"5. The automobile manufacturers themselves recognize the pick up to be designed primarily for transporting persons."

The evidence presented at the trial was brief and we shall review it when apposite to a point under discussion. Counsel have assiduously briefed the questions involved. There appears to be a dearth of appellate decisions, both domestic and foreign, on the points involved and we are satisfied they have all been presented for our consideration. Curiously, both parties cite the same authorities, in some instances, to support their respective positions.

As we have observed, plaintiff's five contentions of error can be fairly reduced to these two: 1. The words "designed primarily" as used in the policy are ambiguous, and such ambiguity should be resolved in favor of plaintiff. 2. Where a vehicle has more than one purpose or design, it is a question of fact to be determined by a jury as to which use is primary. In this determination, the principal use made of the vehicle by the insured is controlling.

 All agree plaintiff is entitled to recover if the 1962 Chevrolet half ton pickup deceased was occupying at the time of the collision was a "private passenger automobile" defined in the policy further as a "private automobile designed primarily for transporting persons". Are these policy

terms ambiguous as they relate to that half ton pickup? If so, we are required to construe the insurance contract strictly against the insurer and liberally in favor of the insured. 44 C.J.S. Insurance § 297, page 1166; Hoover v. National Casualty Co., 236 Mo.App. 1093, 162 S.W.2d 363. The language of a contract is ambiguous when there is doubt or uncertainty as to its meaning and it is fairly susceptible of two interpretations. 44 C.J.S. Insurance, loc. cit.; Blashfield, Automobile Law and Practice, Volume 7, page 212; Union Electric Co. v. Pacific Indemnity Co., Mo.App., 422 S.W.2d 87. "Ambiguity [in a policy] arises when there is duplicity, indistinctness or uncertainty of meaning [of words used in a policy.]" Swaringin v. Allstate Insurance Company, Mo.App., 399 S.W.2d 131, at 133. Or, as defendant contends, does the policy definition, "Private automobile designed primarily for transporting persons" dispel any ambiguity which otherwise might have existed?

The term "private passenger automobile", without further policy definition, has been held to be ambiguous when applied to a half ton pickup in Detmer v. United Security Insurance Company, Mo.App., 309 S.W.2d 713. That case involved a claim for property damage to a 1954 half ton Ford pickup. The insurance policy afforded coverage to the insured while operating a non-owned "private passenger automobile"; that phrase was not further defined in the policy. Appellant contended that vehicle, as a matter of law, did not come within the meaning of "private passenger automobile". No evidence was offered as to the construction of the pickup or the use made of it. Relying on the leading case of Aetna Life Ins. Co. of Hartford, Conn. v. Bidwell, 192 Tenn. 627, 241 S.W.2d 595, the court, in effect, judicially noted that "such half-ton pickups are adapted for and commonly used in part as passenger cars" (Detmer v. United Security Insurance Company, Mo. App., 309 S.W.2d 715). It also reviewed numerous decisions from other jurisdictions, most of which have been briefed by counsel

on this appeal, and concluded, at 309 S.W.2d 717:

"It is our opinion * * * that in each case the ultimate question to be determined is one of fact—that is, was the automobile within the meaning of the policy, a 'private passenger automobile'? Was it a motor vehicle designed and commonly used for and was it actually being used for transporting passengers? In order to determine this ultimate question, evidence as to the construction of the vehicle, how such vehicle was commonly used, and how it was being used is competent and material. Probably in some instances the evidence would be so overwhelming, as with a tractor-trailer or a sports convertible, as to make determination of that fact a question of law. * *"

In Fidelity and Casualty Co. of N. Y. v. Martin, C.A. 9, 66 F.2d 438, decided in 1933, the policy afforded coverage to the insured "while riding in * * * or on, driving * * * a private passenger automobile". It excluded coverage "while riding or driving in or on any motorcycle, automobile truck". None of the terms was further defined. At the time of the occurrence, the insured was on a fishing trip, driving a "Ford Roadster Pick-up closed cab" purchased in 1929. It was equipped with a removable box at its rear, 54 inches by 43 inches in dimension. The vehicle actually was used both for the cartage of light burdens and for pleasure purposes. The question presented was whether the pickup was a "private passenger automobile" within the meaning of the policy. The court concluded, at pages 440–441:

"We see no escape from the proposition that under the evidence the question was one of fact. It the car had been a Ford roadster equipped to carry passengers only, or a heavy truck solely adapted to carry freight, * * * no doubt the question of the applicability of the policy of insurance * * * would be a question of law, but, where the automobile is of the character disclosed by the evidence, its

classification is one of fact to be determined by the court or jury, as the case may be."

The court also held that the use made of the vehicle by the insured was material to such determination.

In Poncino v. Sierra Nevada Life & Casualty Co., 104 Cal.App. 671, 286 P. 729, (1933), defendant undertook to insure the life of Eugeno Poncino against death resulting from accident occasioned by "the wrecking of any private passenger motor-driven car" (not further defined) in which he was riding or driving. The vehicle in question was equipped with a delivery wagon body and the issue was whether it was a "private passenger motor-driven car" within the meaning of the policy. The court held it was a jury issue in view of the evidence as to the use to which it had been put. It observed: " * * * the manner in which a vehicle is used, as well as its construction, is an important factor in determining its character". See also, Smith v. Maryland Casualty Co., 63 N.D. 99, 246 N. W. 451.

On the other hand, in La Fon v. Continental Casualty Co., 241 Mo.App. 802, 259 S.W.2d 425, it was held as a matter of law that a 1950 Studebaker pickup, being used by a dragline operator while returning to his home from work, was not a "private pleasure type automobile". The court found that policy provision unambiguous as it related to the described vehicle. That insuring clause, however, is so significantly different from the one under consideration as to effectively eliminate that decision as a precedent for us. Compare: Senn's Adm'x v. Michigan Mutual Liability Co. (Ky. Court of Appeals, 1954), 267 S.W.2d 526.

Another common source of ambiguity in such insurance policies is a clause which specifically excludes certain vehicles, thereby, inferentially, admitting all others to coverage. Aetna Life Insurance Co. v. Bidwell, supra; Hoover v. National Casualty Co., supra; and involving a pickup,

Gaumnitz v. Indemnity Insurance Co. of North America, 2 Cal.App.2d 134, 37 P.2d 712 (1934). Of such is not the problem confronting us.

■ Upon a consideration of all the authorities to which we have been directed and of which we are aware, we deem the correct rule to be that where an insurance contract undertakes to insure the operator or occupant of a "private passenger automobile" without further policy definition thereof, an ambiguity exists as to whether a 1962 Chevrolet half ton pickup is intended to be covered thereby. That determination is one of fact for the jury. Detmer v. United Security Insurance Co., supra.

■ The policy under consideration, however, does undertake to define "private passenger automobile" as "a private automobile designed primarily for transporting persons". Respondent insurer contends: " * * * where the phrase 'private passenger automobile' has been defined, as it was in the instant policy, (the cases) have held that the insurer was entitled to judgment as a matter of law". Implicit in this argument is the assumption that the court, having heard no evidence, must take judicial notice that the vehicle under discussion was "designed primarily" by the manufacturer to perform some principal function other than that of transporting persons. For the same reasons that we decline a similar request by plaintiff, which are amply stated hereinafter, we decline, as well, that of defendant. We judicially know that such vehicles "are adapted for and commonly used in part as passenger cars": Detmer v. United Security Insurance Co., supra. We judicially know, as well, that such vehicles are adapted for and commonly used in part to bear freight and merchandise. Which use was intended by the manufacturer to be primary is doubtful as a fact of general knowledge, and therefore, it cannot be accorded judicial recognition. Kamo Electric Co-op, Inc., v. Dicke, Mo.App., 296 S.W.2d 905. Otherwise stated, the policy "definition" does not

dispel the ambiguity previously noted, so that a jury question is presented as to whether the vehicle in question was "a private automobile designed primarily for transporting persons". The authorities we have considered convince us of the futility of fastening an immutable classification upon such a versatile vehicle as a half ton pickup. Furthermore, the insurer had it within its ready means to have removed all uncertainty whether coverage to such a vehicle was intended. It could either have specifically excluded it, Detmer v. United Security Insurance Company, supra, 309 S.W.2d at pages 717–718, or have employed a more preclusive definition. Cf. Spence v. Washington Nat. Ins. Co., 320 Ill.App. 49, 50 N.E.2d 128 (1943).

■■ Plaintiff contends that not only is a jury issue raised as to whether the 1962 Chevrolet half ton pickup properly comes within the policy coverage but also, in this determination, the principal use made of the vehicle by the insured is both controlling and material. Under this specific policy, we conclude, it is neither. Although the terms of this policy, being ambiguous, must be construed most favorably to the insured and strictly against the insurer, that rule is "subject to the * * * limitation that such language ordinarily cannot be construed otherwise than according to its plain and ordinary meaning"; 44 C.J.S. Insurance § 297, p. 1190. Also, Blashfield, Cyclopedia of Automobile Law and Practice, op. cit., Volume 7, page 212. The word "designed" as contained in a statutory definition was construed in State of Missouri v. Lasswell, Mo.App., 311 S.W.2d 356. The defendant was charged with driving a commercial vehicle which failed to display certain information as required by statute. Defendant contended his 1955 Ford pickup was not a commercial vehicle. The court, sustaining the conviction, considered the statutory definition of "commercial vehicle": "A motor vehicle designed * * * for carrying freight and merchandise." It held that when applied to property such as defendant's truck, the word

"designed" refers to the *purpose* for which it was constructed and not the *use* to which it was put by the purchaser; at pages 358–359:

> "When applied to property, 'designed' ordinarily refers to the purpose for which it has been constructed [26A C.J.S. 863], and the purpose contemplated and intended by *the manufacturer, not the purchaser*, usually becomes the controlling factor. (Citations).

> " * * * 'a motor vehicle designed * * * for carrying freight and merchandise' [Section 301.010(1)], is a motor vehicle suitable and adapted for the purpose, intended by the manufacturer, of the transportation of goods and tangible articles of commerce, whatever they may be.

> " * * * defendant's argument loses sight of the fact that the determinative issue was *not* whether defendant's pickup actually had been used for carrying merchandise * * * but rather was whether his pickup was a 'motor vehicle designed * * * for carrying freight and merchandise' * * * i. e., whether it was suitable and adapted for the purpose, intended by the manufacturer, of the transportation of goods and tangible articles of commerce, whatever they might have been."

Of similar import is the holding in United States v. Sommerhauser, (U.S.D.Ct., Kansas 1932) 58 F.2d 812, where the government contended defendant's truck should be forfeited by statute relating to property designed for the manufacture of liquor. The court denied forfeiture and stated, at page 813:

> "The government contends that the word 'designed' means the use to which the owner intends to put the property. 'Design' is sometimes synonymous with 'intent'; but physical property has no intention; and ordinarily, if property is spoken of as 'designed,' it refers to the purpose for which it was constructed."

Webster's Third New International Dictionary defines "primary" as: "1st in order of time or development * * * first in rank or importance * * * something that stands first in order, rank or importance * * * CHIEF, PRINCIPAL * * *". Equivalent definitions are rendered for "primary" and "primarily" in a number of judicial decisions found in Words and Phrases, Volume 33, p. 559.

■ The clear meaning of the words "designed primarily" within the context of the policy issued by defendant is the chief or principal purpose for which the vehicle was constructed, and the purpose intended by the manufacturer is controlling. Ultimately, therefore, whether plaintiff may recover under the policy depends upon whether there was substantial evidence that the manufacturer of the 1962 Chevrolet half ton pickup intended its principal purpose as that of transporting persons. A review of all the evidence considered in a light most favorable to plaintiff requires the conclusion that she did not make a submissible case.

Plaintiff and her husband, now deceased, lived on a 160 acre farm near Garden City, Missouri. Mr. West was a foreman for a construction firm and did no farming. Apart from the occasional use of this vehicle to carry groceries and to carry a log, jack and chain in its bed, it was used exclusively for the transportation of persons. The vehicle bore a Missouri truck license. Joseph M. Crahan, vice president of R. B. Jones & Sons, Inc., a Kansas City insurance agency, testified for plaintiff. He was an underwriter and identified the American Casualty Manual published by the National Bureau of Casualty Underwriters. That organization consisted of about fifty automobile casualty companies associated for the purpose of establishing insurance rates based upon loss experience. There was no evidence or contention that defendant insurance company had ever agreed to accept or be bound by the classifications contained in the Manual. Page 27 of the Manual was received in evidence. It related to definitions of "private passenger automobile", but no explanation was offered as to how the classifications or definitions were determined. Among the vehicles classified as a private passenger automobile was "(b) A motor vehicle with pickup body * * * with a load capacity of 1,500 pounds or less * * *". Mr. Crahan professed no unusual knowledge concerning the design of automobiles and trucks. We find nothing in Mr. Crahan's testimony by which the jury's verdict can reasonably be supported.

If plaintiff made a submissible case, it could only have been accomplished by the testimony of Mr. James Thomas Riley, Regional Merchandising Manager of New Trucks for the Chevrolet Division of General Motors. He supervised the sale of some 65,000 trucks to about 973 dealers throughout portions of ten states. He was familiar with "the construction and specifications of pickup trucks as well as sedans and station wagons and carry-alls", including the 1962 models of these vehicles. Whether or not he was intended as an expert, he testified as one both during direct and cross-examination. This witness undertook to make detailed comparisons between a 1962 Chevrolet half ton pickup, Chevrolet passenger vehicles and certain trucks, including their respective steering ratios, suspension systems, effective brake lining areas, frames, wheel bases, etc. There is an indefinite aspect about his testimony only because it is not always clear whether his references to "pickups" and "trucks" related to the 1962 half ton model or others. Very often it explicitly related to other models. As best as we are able to determine, the only absolute structural identity between the 1962 half ton pickup and a standard sedan was the steering ratio of 24 to 1. There were, however, several areas of similarity, such as brakes, wheel bases and curb weights. There was no explanation offered as to how these similarities entered into the purposes for which the respective vehicles were manufactured.

Mr. Riley also testified that in 1966, the sale of "campers" constituted twenty percent of all pickup sales. In 1962, however, only eight percent of all pickup sales were for campers, and of that eight percent, about sixty-five percent were three quarter ton pickup sales. Significantly, Chevrolet did not manufacture campers, as such, so that a purchaser of a pickup intending it for camper purposes would be required to purchase the superstructure from a different manufacturer.

■ The testimony elicited from Mr. Riley upon cross-examination amplified portions of his testimony during his direct examination. Also, certain other evidence was elicited bearing directly on the manufacturer's purpose intended for the 1962 half ton pickup. He testified that there was a difference in the effective lining areas of the respective brakes and that the torsion bar used in the half ton pickup and sedans was different, all unexplained as to purpose or function. Also, although "X" frames were used in the manufacture of both, the pickup frame was reinforced in some manner because of the heavier loads expected to be borne by it. He also identified the Chevrolet 1962 shop manual, issued by his employer and dealing with trucks. Pickups were covered in the truck manual. He also identified a truck data book for 1962 relating to Chevrolet pickups. He identified the vehicle in issue as "a model C–1404 Chevrolet pickup truck". The foreword to that 1962 truck data book, immediately before the section dealing with pickups, contained certain suggested questions to be asked of prospective purchasers of pickups. Among them is found: "What is the maximum length of the body of equipment to be used?" Mr. Riley advanced as the reason for that question " * * * to find out what they want to haul in it * * * ". It was anticipated, he testified, that such trucks would be used to haul merchandise, goods and equipment. That section of the data book dealing with pickup trucks listed "typical users" the manufacturer had in mind for their use. Seventeen "typical users" were enumerated in evidence, ranging from automotive service stations to public utilities. Mr. Riley admitted that the primary interest of such users would be the transportation of merchandise, equipment and such, not the transportation of persons and that such was the intention of the manufacturer. It is abundantly clear from his testimony that the manufacturer classified and considered the 1962 Chevrolet half ton pickup as a truck, a vehicle constructed by it for the principal purpose of transporting merchandise and goods. Mr. Riley's testimony was the only testimony offered by either party on this essential issue. Plaintiff is bound by the unfavorable and uncontradicted testimony of Mr. Riley. There is no evidence, through Mr. Riley or any other witness from which the jury could reasonably have inferred that the manufacturer's purpose in constructing the vehicle in question was principally for the transporting of persons. Plaintiff failed to make a submissible case. Reece v. Reed, Mo.Sup., 326 S.W.2d 67; Lowes v. Union Electric Company, Mo. App., 405 S.W.2d 506; Taylor v. Vestal, Mo.Sup., 304 S.W.2d 820.

Finally, in her reply brief, plaintiff urges this court to take judicial notice "of the facts in the article in Business Week". It refers to certain excerpts therefrom which are reprinted in appellant's brief. That article contains such "facts" as:

"Sleek and streamlined, the new pick ups look more like passenger cars than trucks, and for good reason. The 1964 Chevelle El Camino, for example, is built on a passenger car chassis and is, according to J. E. Coulan, assistant sales manager in charge of trucks at Chevrolet, 'a passenger car licensed as a truck'."

■ The application of the doctrine of judicial notice, either as a rule of evidence or as an instrument of judicial reasoning, is subject to well recognized limits. The basic operative condition of judicial notice is the notoriety of the fact to be no-

ticed. It must be part of the common knowledge of every person of ordinary understanding and intelligence; only then does it become proper to assume the existence of that fact without proof. It follows, therefore, that judicial notice must be exercised cautiously, and if there is doubt as to the notoriety of such fact, judicial recognition of it must be declined. Timson v. Manufacturers' Coal & Coke Co., 220 Mo. 580, 119 S.W. 565; 74 Law Quarterly Review 59 (1958), "The Limits of Judicial Notice"; Wigmore on Evidence, Third Edition, Volume IX, page 531, et seq. As we understand it, plaintiff requests in this instance that we apply the doctrine as a rule of evidence; that is to say, she requests that we acknowledge the existence of certain "facts" as declared in the publication, without requiring their proof. We have not been directed to any specific fact or facts to be judicially noticed. Assuming the information quoted above from the article is relevant to the trial issue involving a 1962 Chevrolet half ton pickup and further assuming it to be such a "fact" of general knowledge properly subject to judicial notice (which we do not acknowledge), it would still be subject to rebuttal. The taking of judicial notice of a matter in the sense proposed is but a prima facie recognition of it and does not foreclose its rebuttal by the other party. Scheufler v. Continental Life Ins. Co., 350 Mo. 886, 169 S.W.2d 359; Brock v. American Central Life Ins. Co., Mo.App., 44 S.W.2d 200; 56 Dickinson Law Review 464 (1952), "Judicial Notice and Rebutting Evidence".

The basic soundness of the rule permitting rebutting evidence in such instances is demonstrated by the record on this appeal. It should be remembered that plaintiff's trial theory was: "Where a vehicle has more than one purpose or design it is a question of fact for the jury to determine which use is 'primary'" (Point 4 of Appellant's Brief). Plaintiff offered Mr. Riley to prove that the vehicle in question was designed primarily for transporting persons. He offered no substantial testimony from which that ultimate fact could be resolved by the jury favorably to plaintiff. To the contrary, his testimony effectively tended to prove that its principal purpose was to transport merchandise, goods and equipment. If we judicially noticed the "facts" contained in the Business Week article relating to that issue, and thereby restored to plaintiff her jury verdict, we would, in effect, be directing a verdict for the party charged with the burden of proof without allowing the opposing party the right to adduce rebutting evidence. The absurdity of such a proposition is self-evident. The article contained no "facts" properly subject to judicial recognition, and we accord them none.

The judgment is affirmed.

HENLEY, P. J., and SEILER, J., concur.

STORCKMAN, J., not sitting.