**SLAY WAREHOUSING COMPANY, INC., a corporation, Appellant,**

v.

**RELIANCE INSURANCE COMPANY, a corporation, Appellee.**

No. 72–1039.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1972.

Decided Jan. 18, 1973.

Rehearing Denied Feb. 8, 1973.

John J. Stewart, Clayton, Mo., for appellant.

Joseph L. Leritz, St. Louis, Mo., for appellee.

Before GIBSON and LAY, Circuit Judges, and DURFEE, United States Court of Claims Judge.

LAY, Circuit Judge.

■ This is an action brought by Slay Warehousing Company, Inc., a Mis-

souri corporation, against Reliance Insurance Company under an endorsement attached to an inland marine policy which provides warehousemen coverage against liability to third parties. The endorsement covers "loss and destruction of or damage to property of others contained in the premises." The primary issue is whether the insurer is liable for expenses incurred by Slay Warehousing in taking reasonable means to protect chemicals stored in its warehouse from damage due to exposure following the collapse of the warehouse wall. The chemicals were owned by the Monsanto Company. The insurer settled Monsanto's claim for approximately $38,000 but refused to pay its assured for its expenses in protecting the exposed chemicals from further damage.[1] The trial court held in favor of the insurer and Slay Warehousing has appealed. We reverse and remand for consideration of the damages incurred.

The evidence shows that in July of 1964 the north wall and roof of the assured's warehouse, located in St. Louis, Missouri, collapsed exposing stored chemicals to elements of the weather. It is undisputed that if either of the two chemicals, Salt Cake and Santosite, both stored in dry bulk, became wet, they would have solidified and turned "hard as concrete."

Slay Warehousing immediately notified its liability carrier of the structural collapse and sought its consent to use all reasonable means to protect and salvage the chemicals from further loss or destruction. The company sent an insurance adjustor, George Kaja, to the site for the purpose of handling the claim. According to Kaja his duties included "complete investigation as to cause, the property involved, its value, condition of salvage." The evidence is conflicting as to Kaja's response to the assured's request for the company to assist in protecting the chemicals from further damage. Kaja claimed that he told warehouse officials "it was strictly their baby." [2] Officials of Slay Warehousing on the other hand contended that Kaja's response was that he would forward the request to the company. Despite repeated demands extending over a period of several months, the company failed to respond directly as to whether it would assume the expense involved.

There is no dispute that the warehouse company undertook immediate and reasonable means to prevent further damage to the chemicals. According to Slay Warehousing's statement, costs and expenses were incurred, *inter alia*, for labor, transportation charges in removing the chemicals to another warehouse, moving debris, replacing tarps on the roof, rental of a portable hopper and conveyor for removing the damage, and storage charges at another warehouse.

Slay Warehousing urges that it should be reimbursed by reason of the policy terms which require the assured to "take all reasonable means to protect, safeguard and salvage the property." The argument is made that the immediate efforts to protect the chemicals prevented a greater loss to the insurance company. The company's response in essence is that the policy protects the assured only from liability to third parties, that the assured had a duty to mitigate its loss and that under the terms of the policy the assured could not incur any expense without the written consent of the insurance company.

1. Slay Warehousing alleges its expenses totaled $22,634.87.

2. Nevertheless, Kaja also testified that he was impressing *many times* upon Strait, the manager of the Slay Warehouse, that he (Kaja) "wanted him to get on with the protection of that salvage." To the same effect, Strait testified that Kaja made numerous calls to him, insisting that Slay do the salvage, and that he had numerous calls from Kaja that he "wasn't moving fast enough," and that "it didn't seem to be moving as fast as they wanted it." There is no conflict as to this evidence, which is certainly not consonant with the contention of Reliance that it "took no part in any salvage operations."

The present policy reads.: "To pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay by reason of liability imposed . . ." [3] The Supreme Court of Pennsylvania has construed similar language within a liability insurance policy to require reimbursement of expenses incurred by a landowner in arresting a threatened landslide and preventing more serious damage. Justice Musmanno, in discussing a New Hampshire decision, explained:

"The policy was not limited in its terms as the one in Desrochers v. New York Casualty Co., 99 N.H. 129, 106 A.2d 196, 198, relied upon by the defendant. There the carrier agreed—

'to pay on behalf of the insured all sums which the insured shall become legally obligated to pay *as* damages * * * because of * * * destruction of property.' (Emphasis supplied).

The instant policy is not so limited. By its terms the defendant agreed to pay such sums as the plaintiff became obligated to pay 'by reason of' the liability imposed upon him by law for damages because of injury to or destruction of property." Leebov v. United States Fidelity & Guaranty Co., 401 Pa. 477, 165 A.2d 82, 84 (1960).

The Pennsylvania Supreme Court went on to say:

"If the plaintiff had not taken immediate and substantial measures to remedy the perilous situation, disastrous consequences might have befallen the adjoining and nearby properties. If that had happened, the defendant would have been required to pay considerably more than is involved in the present lawsuit. It would be a strange kind of argument and an equivocal type of justice which would hold that the defendant would be compelled to pay out, let us say, the sum

3. Although the coverage provided is in the form of a liability policy, the endorsement itself is attached to a marine policy insuring Slay Warehousing's property. This has little relevance other than suggesting analogous study within the marine insurance field. At an early date the Supreme Court of the United States discussed the equitable principles that govern marine insurance. In Peters v. Warren Insurance Co., 39 U.S. 98 (14 Pet. 99), 10 L.Ed. 371 (1840), the Court sustained Daniel Webster's argument that an underwriter was liable to its assured for a partial loss to another vessel even though the loss was only indirectly related to the insured risk. Mr. Justice Story, writing for the Court, observed:

"The vessel may have been long before dismasted or otherwise injured, or abandoned by her crew in consequence of the perils of the winds and waves; and the salvage decreed in such a case, would seem, at the first view, far removed from the original peril, and disconnected from it; and yet, in the law of insurance, it is constantly attributed to the original peril, as the direct and proximate cause; and the underwriters are held responsible therefor, although salvage is not specifically, and in terms, insured against." *Id.* at 110 (14 Pet. at 109), 10 L.Ed. 371.

Missouri law also recognized early in its history the liability of an underwriter for the expense in salvage. In Dix v. Union Insurance Co., 23 Mo. 57 (1856), a steamboat was grounded and in immediate danger of being lost or seriously damaged, and the assured incurred considerable expense in launching the boat. The insurance policy on the steamboat made it the duty of the assured to "use every practicable effort for saving the boat." The court held the insurer liable for the reasonable expenses in launching the steamboat saying:

"Nor was there a necessity that the boat should be in danger of total loss. It is sufficient that the expense was necessarily incurred in rescuing the boat from any danger for which the underwriters would have been liable." *Id.* at 61.

The issue in these early cases dealt with the underwriter's argument that since the policy covered only losses arising from the proximate cause of the damage, they could not be responsible for any additional expense which was not immediately connected with the peril. The early law developed, however, that costs and expenses incurred in salvage were a "natural consequence" of the peril and thus covered by the policy. Peters v. Warren Insurance Co., supra.

of $100,000 if the plaintiff had not prevented what would have been inevitable, and yet not be called upon to pay the smaller sum which the plaintiff actually expended to avoid a foreseeable disaster." *Id.* at 84.

A similar result was reached by a Louisiana Court of Appeals under a different exclusion clause [4] where the court observed:

"[I]t might be argued that the exclusionary clause is included as a part of a contract which does not contain any specific contractual obligation on the insurer to bear the expense of rescue, salvage and preservation. The sole answer to this contention is that an insured is entitled to reimbursement of the expenses incurred in protecting his insurer against loss by application of general principles of law and equity." Harper v. Pelican Trucking Co., 176 So.2d 767, 773 (La.App. 1965).

See generally Teeples v. Tolson, 207 F. Supp. 212 (D.Or.1962).

Obviously, each case must be examined in light of the specific insuring agreement and the law of the particular jurisdiction. Some jurisdictions have denied recovery of expenditures under liability policies. Cf. Farr v. Traders & General Insurance Co., 235 Ark. 185, 357 S.W.2d 544 (1962); J. L. Simmons Co. v. Lumbermen's Mutual Insurance Co., 84 Ill. App.2d 98, 228 N.E.2d 227 (1967). See 33 A.L.R.3d 1272, § 5 (1970). We conclude, however, that the more analogous rule applicable to the present policy provisions is that which allows recovery in accord with the Pennsylvania and Louisiana decisions.[5]

The cooperation clause under Paragraph 4 of the policy requires the assured to exercise all reasonable means to protect, safeguard and salvage the property. If it fails to do so, there exists the strong possibility that it may forfeit its coverage altogether. See 18 Couch on Insurance 2d § 74:642, at 573–574 (1968); cf. Copeland v. Phoenix Insurance Co., 6 Fed.Cas. pp. 507, 508 (No. 3,210) (C.C.Mo.1868), aff'd, Copelin v. Insurance Co., 76 U.S. 461, 9 Wall. 461, 19 L.Ed. 739 (1869); Delametter v. Home Insurance Co., 233 Mo.App. 645, 126 S.W.2d 262, 270 (1939). Protective acts may be to the direct or incidental benefit of the assured so as to prevent further loss to its own property—but it is patently clear that the primary reason for such a provision within the policy is for the company's protection against liability for greater loss. Many insurers provide within property insurance policies that such protection must be afforded and it shall be presumed that the assured is acting at the insurance company's request. See Emmco Insurance Co. v. Burrows, 419 S.W.2d 665, 669 (Tex.Civ.App. 1967); Southwestern Fire & Casualty Co. v. Kendrick, 281 S.W.2d 344, 346 (Tex.Civ.App. 1955); City Coal & Supply Co. v. American Automobile Ins. Co., 99 Ohio App. 638, 133 N.E.2d 415, 416 (1954). Such a provision is missing here. However, as indicated, the obligation of the insurer can also be implied by the terms of the cooperation clause which requires the assured to take such action. Thus, we conclude that the obligation to pay the expenses of protecting the exposed property may arise from either the insurance agreement itself,

---

4. The exclusionary clause read:
   "THIS POLICY DOES NOT INSURE
   "Any liability of the Assured as a carrier for loss or damage:

   .    .    .    .    .    .    .

   (d) Caused by the neglect of the Assured to use all reasonable means to save and preserve the property at and after any disaster insured against;"

5. In discussing the expenses of protecting damaged property Couch remarks that

"[a]s the insured is under the duty to mitigate damages by taking care of the damaged property it follows that he is entitled to expenses incurred in so doing, even though the items involved may be ones as to which there is no express policy coverage." 15 Couch on Insurance 2d § 54:174, at 424 (1966). Cf. City Coal & Supply Co. v. American Automobile Ins. Co., 99 Ohio App. 638, 133 N.E.2d 415 (1954).

Leebov v. United States Fidelity & Guaranty Co., 165 A.2d at 84, or an implied duty under the policy contract based upon general principles of law and equity,[6] Harper v. Pelican Trucking Co., 176 So. 2d at 773.

The insurer urges that the express terms of Paragraph 4 of the policy require the written consent of the insurer before the assured may incur any expense obligating the company.[7] We construe the "expense" and "consent" clause to be unrelated to the requirement that the assured use reasonable means to protect the property.[8] Under the insurance company's contention the clause would read ". . . The Assured shall take all reasonable means to protect, safeguard and salvage the property . . . but the Assured shall not . . . voluntarily . . . incur any expense . . . without the written consent of the company. . . ." Such a construction is self-contradictory. The assured in the first instance is required to take all reasonable means for protecting the property then, in the same context, he is told that he may not act voluntarily. If the intended meaning is that written consent of the company is required before reasonable means may be undertaken to protect the property, immediate safeguards would be delayed while awaiting formal approval, therefore, as in the present case, subjecting the property to sudden loss and the insurer to greater liability.[9]

The sense in which a word or phrase is used is normally determined by its context. See Beister v. John Hancock Mutual Life Insurance Co., 356 F.2d 634, 638 (8 Cir. 1966); National Fire Insurance Co. v. Elliott, 7 F.2d 522, 524 (8 Cir. 1925); First National Bank v. Farmers New World Life Insurance Co., 455 S.W.2d 517, 523 (Mo.App. 1970); Hall v. Federal Life Insurance Co., 71 S.W.2d 762, 764 (Mo.App. 1934). The clause relating to "expense" here is more reasonably related to the "investigation and disposition of claims and suits" mentioned in the preceding sentence. Otherwise the contention must be that the assured is to undertake protective means at his own expense on the happenstance that the insurer may later consent to

---

6. Implicit within any contract is the concept of good faith and fair dealing. See Earle R. Hanson & Associates v. Farmers Co-op Creamery Co., 403 F.2d 65, 69 (8 Cir. 1968). Especially is this so when the parties enter into a contract of adhesion where terms are not openly negotiated. It is recognized:

   "In dealing with standardized contracts courts have to determine what the weaker contracting party could legitimately expect by way of services according to the enterpriser's 'calling', and to what extent the stronger party disappointed reasonable expectations based on the typical life situation." Kessler, Contracts of Adhesion—Some Thoughts About Freedom of Contract, 43 Col.L. Rev. 629, 637 (1943).

7. Paragraph 4 of the conditions:

   "COOPERATION BY ASSURED The Assured shall take all reasonable means to protect, safeguard and salvage the property and shall cooperate with the company in facilitating the investigation and disposition of claims and suits and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits; but the Assured shall not, except at his own cost, voluntarily assume any liability nor incur any expense, nor settle any claim without the written consent of the company previously given. The company reserves the right to settle any claim, suit or other proceedings as it may deem expedient."

8. The language of the insurance contract is ambiguous, and to be interpreted against the insurer, "when there is doubt or uncertainty as to its meaning and it is fairly susceptible of two interpretations." English v. Old American Insurance Co., 426 S.W.2d 33, 36 (Mo.1968). See generally State ex rel. State Dept. of P. H. & W. v. Hanover Insurance Co., 431 S.W. 2d 141, 143 (Mo.1968); 1 Couch on Insurance 2d § 15.73, at 776–789 (1959).

9. Furthermore, if this were the construction intended, the company would be estopped to assert such a defense either because it failed to ever respond to the warehousemen's request or because, under Mr. Kaja's version, it totally refused to consider the request.

underwrite it. This reduces the clause to an absurdity. We cannot assume the assured would be subjected to a futile act, i. e., seek the underwriter's consent to incur expenses which the assured is at all times obligated to pay. Of further significance is the fact that the "written consent" of the company is contained only in the clause, separated by a comma, relating to the settlement of a claim. It would be redundant for the policy to read that an assured shall not "except at his own cost, voluntarily assume any liability nor incur any expense . . . without the written consent of the company. . . ." The words "not . . . voluntarily" necessarily imply that some form of consent is already required.

The trial court found Slay Warehousing's damage to be in the sum of $22,634.87. This amount is reflected on the assured's statement of costs as contained in the record. It is obvious that many of the items on the statement such as attorney fees, photographer, cleaning up the debris, etc., are improperly included as expense items for protecting the chemicals in question. We hold the finding as to the damage to be plain error. The burden rests on the plaintiff to show what expenses were incurred as "reasonable means to protect, safeguard and salvage the property" under the policy. The cause is remanded for redetermination of the damage item.

Judgment reversed and remanded.