**INTERNATIONAL COMMODITIES EXPORT CORP., Plaintiff,**

v.

**AMERICAN HOME ASSURANCE COMPANY, Defendant.**

**No. 87 Civ. 0717 (MGC).**

United States District Court, S.D. New York.

Dec. 19, 1988.

---

Ben–Veniste & Shernoff by Richard Ben–Veniste, Peter D. Isakoff, Washington, D.C., and Thomas J. Fitzpatrick, New York City, for plaintiff.

Kennedy & Lillis by Donald M. Kennedy, John H. Cleveland, III, New York City, for defendant.

## OPINION AND ORDER

CEDARBAUM, District Judge.

International Commodities Export Corp. ("ICEC") sues American Home Assurance Co. ("American Home") for reimbursement of expenses incurred by ICEC in successfully defending against a claim which, if upheld, would have been recoverable from American Home. ICEC moves for partial summary judgment limited to the issue of American Home's liability, with the amount of damages to be determined at trial. For the reasons discussed below, the motion is denied.

## BACKGROUND

The material facts are not in dispute. ICEC is an international trading company with its principal place of business in White Plains, New York. In 1982 and 1983, ICEC, a division of ACLI International, Inc., was insured under ACLI's marine open cargo policy no. 82386, issued by American Home. The policy, which will be discussed in more detail below, insured all goods shipped by ICEC against "all risks of physical loss or damage," subject to certain exceptions not at issue in this case.

In 1982, in accordance with a tender by the Government of Indonesia for the purchase of fertilizer, ICEC entered into a

contract with P.T. Dharma Niagra ("Dharma"), a state-owned trading company, for the sale of 123,000 metric tons of fertilizer. The fertilizer was priced "Cost & Freight/Free Out" ("C & F"), meaning that the price included the cost of the goods and the freight charges and that Dharma bore the cost of unloading the goods at the discharge port. The fertilizer was to be delivered in a series of separately scheduled ocean shipments to various Indonesian ports. The sales contract included an arbitration agreement but did not specify the arbitral forum.

In the summer of 1982, ICEC chartered the M/V Dumbaia for the carriage of one of the fertilizer shipments from Tunisia to Indonesia. In late August of 1982, ICEC received notice that shortly after its departure from Tunisia, the Dumbaia had diverted from her course and anchored off Piraeus, Greece, with claims by the crew of "engine difficulties." ICEC was advised that from then until November of 1982, the crew refused to give anyone access to verify the "engine damage" claim, when a surveyor boarded the vessel pursuant to a court order. The court order was obtained through the efforts of counsel retained by ICEC with the approval of the fertilizer's producer and of Dharma.

In July of 1982, ICEC entered into a multi-shipment contract of affreightment with International Marine Freighting Ltd. ("IMF") for the carriage of fertilizer under the contract with Dharma. On November 15, 1982, pursuant to the contract of affreightment, IMF chartered the M/V Koukounaries K from Three Brothers Shipping Enterprises Ltd. c/o Kollias Shipping Corp., the registered owner, for the carriage of fertilizer from Turkey to Indonesia. In late December of 1982, ICEC was notified that the Koukounaries K had been detained at Port Said, Egypt, evidently at the direction of Three Brothers, falsely claiming non-payment of freight by IMF. Thereafter, ICEC learned that the Koukounaries K was in or near the port of Piraeus and was refusing to proceed to Indonesia because of the registered owner's allegation that the freight remained unpaid.

Shortly after ICEC learned of the Dumbaia's diversion and informed Dharma, a dispute developed between ICEC and Dharma concerning who bore responsibility for the cargo and for the expenses incurred in obtaining its release and onward shipment to Indonesia. Dharma claimed that notwithstanding the C & F terms of the contract, that it neither owned the cargo nor held the risk of loss since the contract required ICEC to deliver the fertilizer to Indonesia. Dharma also claimed that an additional contractual provision imposed the cost of extra delivery expenses on ICEC and that ICEC had wrongly modified certain contractual language when the draft of the contract was translated into English. Dharma made the same claims with respect to the costs arising from the diversion of the Koukounairies K and added the claim that ICEC had breached the contract by not chartering a vessel directly from its registered owner.

In response, ICEC took the position that the risk of loss was on Dharma, and that Dharma should take vigorous steps to secure the cargo's release. ICEC also denied that it was responsible for any costs to get the cargo to its intended destination or that it had changed the terms and conditions of the proposed contract. Finally, ICEC denied any breach of the contract for having employed a vessel that was not chartered from its registered owner.

On February 1, 1983, Dharma announced its intention to seek arbitration of its claims before Badan Arbitrasi Nasional Indonesian ("BANI"), an Indonesian government sponsored arbitration tribunal in Jakarta, Indonesia, unless the matter could be resolved. In April of 1983, ICEC brought an action in the United States District Court for the Southern District of New York, *International Commodities Export Corp. v. P.T. Dharma Niagra Ltd.*, 83 Civ. 2593 (RJW), seeking an order compelling arbitration before a neutral international tribunal, or, alternatively, a declaratory judgment that ICEC had fully performed its obligations under the contract with Dharma. Dharma responded in August of 1983 by bringing suit in Indonesia

to compel arbitration before BANI in Jakarta, and obtained a court order compelling arbitration there. In July of 1984 the parties agreed to arbitrate their dispute before a neutral international panel in Hong Kong and Bali.

Dharma sought to recoup $3.6 million to cover the costs of securing the release of the cargo and shipping it to Indonesia. Dharma also sought to recover certain sums said to be due from ICEC for "despatch" monies and fines or penalties for late shipments under the sales contract. In the final award dated July 11, 1986, the arbitration panel rejected Dharma's claim that ICEC was bound to effect delivery to Indonesia pursuant to the contract and that ICEC was responsible for the costs incurred by Dharma in effecting such delivery. ICEC prevailed on Dharma's other claims as well.

ICEC, through its broker Alexander & Alexander, had notified American Home of the diversions of the fertilizer within a couple of months of each incident. On February 8, 1983, on behalf of ICEC, Alexander & Alexander wrote to American Home, seeking to declare the cargo under the "unpaid vendor" provision of the insurance policy. ICEC based its claim on this provision because the Indonesian government was threatening to "draw down" on ICEC's performance bond at the time. American Home declined the declaration. It rejected the view that ICEC could qualify as an unpaid vendor, since Dharma had paid ICEC under an irrevocable letter of credit. During this period, American Home advised ICEC to act as a "prudent uninsured."

On March 15, 1983, American Home advised ICEC through a letter to Alexander & Alexander that American Home was disclaiming liability under the policy. American Home took the position that since the contract was C & F, Dharma bore the risk of loss of the cargo when the ships were diverted, and if ICEC bore responsibility for any reason not directly related to the cargo, that liability would not be covered under the terms of the policy. American Home's letter established that American Home would not participate in any respect in the ICEC–Dharma dispute. Subsequent requests for reconsideration were rejected.

ICEC filed this complaint against American Home in February of 1987, seeking recovery of its expenses resulting from the diversions. It filed this motion for partial summary judgment on the issue of liability after the completion of discovery. At oral argument, ICEC limited its claim on this motion to those costs relating to the dispute with Dharma, about $1.4 million.

Specifically, ICEC asserts that by defeating Dharma in the arbitration proceedings, ICEC conferred a substantial benefit on American Home since a contrary finding that ICEC bore the risk of loss would have forced American Home to pay for the damages resulting from the diversions, since diversion was a risk covered by the policy. ICEC argues that both the terms of the policy itself, namely the "sue and labor" clause, and general equitable principles require American Home to reimburse ICEC for its costs in exchange for receiving this benefit. American Home responds that even if the costs of the diversions themselves were reimbursable, ICEC's dispute-related expenses would not be recoverable under the policy, and that the circumstances do not require contribution on equitable grounds.

## DISCUSSION

*The "Sue and Labor" Clause*

█ Paragraph 28 of ICEC's cargo policy provides that

In case of any imminent or actual loss or misfortune, it shall be lawful and necessary to and for the Assured ... to sue, labor, and travel for in and about the defense, safeguard, and recovery of the said goods and merchandise, or any part thereof without prejudice to this insurance; nor shall the acts of the Assured or Assurers, in recovering, saving, and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of abandonment; to the charges whereof the said Assurers will

contribute according to the rate and quantity of the sum herein insured.

This provision is commonly known as a "sue and labor" clause, and its somewhat antique verbiage reflects its long use in both English and American marine insurance policies. Sue and labor clauses are intended to encourage an insured to take measures to preserve the subject matter of the insurance policy, in this case the cargo. *See generally* Buglass, *Marine Insurance and General Average in the United States* 332–35 (2d ed. 1981). In exchange, the insurer must reimburse the insured for the expenses it incurs, since the insured has acted to benefit the insurer by averting or mitigating an otherwise recoverable loss. *See, e.g., Blasser Brothers v. Northern Pan–American Line,* 628 F.2d 376 (5th Cir.1980) (sue and labor clause designed to reimburse insured for expenditures made primarily for benefit of insurer to reduce or eliminate covered loss) When a policy contains a sue and labor clause, an insurer may be able to argue that the insured has forfeited its coverage if it does not sue and labor to minimize the covered loss. *See, e.g., Integrated Container Service Inc. v. British Traders Insurance Co.,* [1984] 1 Lloyd's Rep. 154 (C.A.) (assured who fails to perform duty under sue and labor clause runs risk of subsequent claim being rejected).

 ICEC asserts that its successful defense against Dharma's claims conferred a benefit on American Home within the meaning of the sue and labor clause, since, if ICEC had not defended, American Home would have had to pay the costs arising from the ships' diversions. Thus, ICEC argues, the clause requires American Home to reimburse the costs of that defense.

American Home concedes that it would have been bound if the arbitrators had determined that ICEC bore the risk of loss. But American Home distinguishes ICEC's dispute-related expenses from those costs relating directly to the diversions. It contends that the dispute-related expenses were not incurred to protect or preserve the cargo, the subject matter of the policy, but rather resulted from a contract dispute with Dharma. For that reason, according to American Home, ICEC's defense expenses cannot be considered sue and labor charges under the terms of that clause.

In support of its opposition to ICEC's motion, American Home points to cases in which the recoverable sue and labor costs, including litigation expenses, clearly related to the subject matter of the insurance. For example, in *Nishina Trading Co. v. Chiyoda Fire and Marine Insurance Co.,* [1969] 1 Lloyd's Rep. 293 (C.A.), the plaintiff owned cargo carried by shipowners who tried to use the goods as security for their own mortgage. The court allowed the plaintiff to recover from the defendant, who had insured the cargo, litigation expenses that the plaintiff incurred to recover it. Similarly, the court in *International Navigation Co. v. Atlantic Mutual Insurance Co.,* 100 F. 304 (S.D.N.Y.1900), *aff'd,* 108 F. 987 (2d Cir.), *cert. denied,* 181 U.S. 623, 21 S.Ct. 926, 45 L.Ed. 1033 (1901), allowed the plaintiff to recover a proportion of the legal expenses incurred in defending a suit brought by salvage companies against the plaintiff's ship and cargo, which the defendant had insured. *See also Blasser Brothers, Inc. v. Northern Pan–American Line,* 628 F.2d 376 (5th Cir.1980) (any action taken to preserve cargo or mitigate damages includible, but not costs of bringing suit against insurer itself); *St. Paul Fire & Marine Ins. Co. v. Pacific Cold Storage Co.,* 157 F. 625 (9th Cir.1907) (costs of transporting goods to final destination recoverable, where ship was trapped by ice and goods were covered under cargo policy); *Northwestern National Insurance Co. v. Chandler Leasing Corp.,* 1982 A.M.C. 1631 (N.D.Cal.1982) (costs of repairing equipment covered by all risks policy recoverable under sue and labor clause if incurred to prevent total or constructive total loss); *Integrated Container Service, Inc. v. British Traders Insurance Co.,* [1984] 1 Lloyd's Rep. 154 (C.A.) (expenses paid to recover containers insured under all risks policy recoverable under sue and labor clause).

American Home also relies on two decisions which specifically focused on whether

the costs of a successful defense were recoverable under a liability policy. In both *Munson v. Standard Marine Insurance Co.*, 145 F. 957 (C.C.D.Mass 1906), *aff'd*, 156 F. 44 (1st Cir.1907), *cert. denied*, 209 U.S. 543, 28 S.Ct. 570, 52 L.Ed. 919 (1908), and *Xenos v. Fox*, [1868] L.R. 3 C.P. 630, *aff'd*, [1869] L.R. 4 Ex. 665, the courts held that the plaintiff could not recover litigation expenses incurred during the successful defense of a negligence action. The courts first held that the language of the policy limited its coverage to damages resulting from an actual finding of liability, and each then addressed whether the expenses were nevertheless recoverable as sue and labor costs.

In *Munson*, the court first questioned whether a sue and labor clause had any real meaning in a liability policy. It then held that, regardless of any general applicability, the clause in that case was specifically limited to the reimbursement of costs incurred to protect other vessels from damage. The court thus rejected the plaintiff's contention that it could recover under the sue and labor clause, since "the cause of the legal expenses involved here arose, not out of the fact that the policy attached, but out of the fact that somebody claimed that it attached when it did not." 156 F. at 48.

The *Xenos* court similarly failed to see a sufficient connection between the sue and labor clause and the liability provision. On appeal, Chief Justice Cockburn emphasized that the sue and labor clause applied only to expenses relating to the insured *property*, not to losses arising from *liability*. The Chief Justice also rejected the plaintiff's contention that the benefit to the defendant was sufficient to allow recovery under the clause: "The view suggested would, no doubt, be an equitable view of the matter. But the parties have not so contracted, and we cannot do it for them." *Xenos*, L.R. 4 Ex. at 667; *see also Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500 (2d Cir.1972) (where insurer's own policy did not contain sue and labor clause, other insurers who had to reimburse an insured for such costs could not seek contribution, notwithstanding that insurer derived benefit from the

expenditures). American Home interprets these decisions to mean that expenses must clearly relate to the subject matter of the insurance policy in order to be reimbursable under the sue and labor clause.

ICEC acknowledges that most sue and labor clause cases involve expenses designed to mitigate physical damage or loss to the subject matter of the insurance. But ICEC contends that this is because cases involving litigation expenses arise less frequently. It argues that not to include within the coverage of the clause those expenses that result in a determination which also prevents a loss from falling upon the insurer would result in a "hyper-technical" distinction. Since American Home faced a potential loss from the determination directly affecting coverage under the policy, and since ICEC averted that loss, ICEC contends that the resulting benefit to American Home is compensable, regardless of whether a physical risk to the cargo was the source of the potential loss.

ICEC cites only one case in support of its argument that the costs of a successful defense are recoverable under a sue and labor clause, *Pride & Son v. The Providence–Washington Insurance Co.*, 6 Pa. D. 227 (Phila.Co.1894). In *Pride & Son*, the plaintiffs sued to recover legal expenses incurred during their successful defense of a claim against their tugboat. Contrary to *Munson* and *Xenos*, the court in *Pride & Son* held that the sue and labor clause in the plaintiff's liability policy covered such costs because the defendant would have had to compensate for the loss of the tug if the plaintiff had lost the case, and because the clause was specifically directed toward actions designed to preserve the tug. The court noted that "it would be a harsh rule of law which would deny them their expenses incurred in the successful resistance of a false claim, which the company would have been compelled to pay in case the tug had been condemned." 6 Pa. D. at 232.

The sue and labor clause at issue in ICEC's policy, like most, specifically covers costs incurred "in and about the defense, safeguard, and recovery of the said

goods." Thus, the clause by its terms requires that reimbursable costs must relate to preserving the cargo or mitigating its loss, and not simply to confer some benefit on American Home. *See Seaboard Shipping Corp. v. Joacharanne Tugboat Corp.*, 461 F.2d 500 (2d Cir.1972); *Xenos v. Fox*, [1868] L.R. 3 C.P. 630, *aff'd*, [1869] L.R. 4 Ex. 665. Furthermore, the case law shows that this connection must be fairly direct. In *Slay Warehouse Co. v. Reliance Insurance Co.*, 471 F.2d 1364 (8th Cir. 1973), for example, the court allowed the plaintiff to recover some of the costs incurred as a result of protecting a third party's property that was placed at risk when its warehouse wall collapsed. However, the court held that the district court committed plain error when it included as expense items attorneys fees, a photographer, and the costs of cleaning up the debris. 471 F.2d at 1369.

The costs of ICEC's successful defense do not appear to be sufficiently closely related to a risk to the fertilizer itself to be reimbursable under the sue and labor clause. Contrary to ICEC's contentions, the immediate source of an insurer's potential exposure to loss must be considered when determining whether the sue and labor clause requires reimbursement. Grounding the clause in the subject matter of the policy is necessary to prevent the clause from becoming an all-purpose indemnity clause for which the parties have not contracted. *See also Louis Magnone, Inc. v. Pacific Coast Fire Insurance*, 197 Misc. 264, 97 N.Y.S.2d 662 (N.Y.City Ct. 1949) (where insurance policy contained no agreement by the insurer to defend insured against groundless actions, insurer not liable for costs of insured's successful defense). In fact, I have been unable to find any case that interprets a sue and labor clause as liberally as a holding in ICEC's favor would require, including a recent Second Circuit case, *Armada Supply Inc. v. Wright*, 858 F.2d 842 (2d Cir.1988). In *Armada Supply*, the court awarded the plaintiff as sue and labor expenses the costs of litigating a breach of contract claim against a third party who had agreed to buy damaged goods which were also covered by the defendants' insurance policies. Although the court primarily focused on the benefits realized by the defendants because of the plaintiff's ultimate recovery, its holding does not change the result here. As noted by the plaintiff there in its brief on appeal, the sue and labor clause at issue specifically required the plaintiff to "ensure that all rights against ... third parties are properly preserved and exercised," brief for Armada Supply Inc. at 57, *Armada Supply*, 858 F.2d 842, a clause "somewhat broader than traditional clauses," *id.*, such as the one found in ICEC's policy here.

*Blaine Richards & Co. v. Marine Indemnity Assurance Co. of America*, 635 F.2d 1051 (2d Cir.1980), while addressing the source of a loss for purposes of the entire policy and not for recoverability under a sue and labor clause, further supports the conclusion that if the sue and labor clause is so limited, to be recoverable, expenses must be closely tied to preserving the insured property or mitigating its loss. In that case, the court examined whether the plaintiff could recover damages resulting from the government's detention of its cargo of beans. The plaintiff argued that even if the detention itself was exempted from the policy's coverage, the proximate cause of the damage was an illegal pesticide treatment which the policy did cover. The court rejected the plaintiff's "but for" analysis and noted that in marine insurance cases the doctrine of "causa proxima non remota spectatur" or "the immediate not the remote cause is considered" applies. *Id.* at 1054. It then considered that the proper way to determine proximate cause in a marine insurance case is to ascertain the "predominant and determinant" or "real efficient" cause of the loss "in accord with the reasonable understandings and expectations of the parties." *Id.* The court concluded that determining proximate cause "is thus a matter of applying common sense and reasonable judgment as to the source of the losses alleged." *Id.* at 1054–55.

The principles of *Blaine Richards* apply here. Although the ICEC–Dharma dispute might not have arisen if the cargo had not

been diverted, and diversion is a covered risk under the policy, "but for" analysis is insufficient for recovery. Instead, the "common sense" approach shows that ICEC's litigation expenses were incurred because its trading partner attempted to shift its own loss onto ICEC. None of ICEC's actions in relation to the dispute were designed to protect the cargo itself from loss or damage arising from the diversions. In addition, unlike the tug in *Pride & Son,* the cargo was not subjected to risk of loss by the outcome of the proceedings.

Finally, ICEC has not contended that the risk of a dispute with Dharma over the meaning of their sales contract was covered by the cargo policy. In short, the parties' "common sense understanding" of the sue and labor clause simply did not include reimbursement of the expenses that ICEC incurred in successfully defending itself against Dharma's claim, regardless of any incidental benefits to American Home.

*Restitution and Unjust Enrichment*

 ICEC argues that even if the sue and labor clause does not cover its dispute-related expenses, American Home should nevertheless reimburse ICEC under general principles of equity. ICEC again points to the benefit that it conferred on American Home by saving it from having to pay the cost of the diversions. It argues that American Home will be unjustly enriched if it may take advantage of this benefit without reimbursing ICEC.

American Home responds that equitable relief is not required here, nor even appropriate. It contends that ICEC's cargo policy is one that is commonly used and well understood, and that it should not be "reformed" by equity without some showing of "egregious unfairness." In addition, American Home points to ICEC's own conduct in its dealings with Dharma as a basis for refusing to provide equitable relief. During contract negotiations, Dharma refused to agree to name an arbitration forum other than Jakarta. ICEC went along with omitting from the written contract their ultimate agreement that arbitration would take place in a "neutral forum" oth-

er than Jakarta. Thus, by failing definitively to settle the issue, ICEC facilitated the dispute, the costs of which it now seeks to recover from American Home.

The Second Circuit has recognized that under the proper circumstances, a court may apply equitable principles to require that a marine insurer who benefits from an insured's efforts shall reimburse the insured for some of the costs. *Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.,* 461 F.2d 500, 505 (2d Cir.1972). The court did not elaborate on those "proper circumstances," since it concluded that certain policy provisions in that case explicitly precluded the court from granting any equitable relief. Here, the policy is silent on the issue of the recoverability of expenses not covered by the sue and labor clause. After examining all of the circumstances, I conclude that ICEC is not entitled to equitable relief.

The Restatement of Restitution, in defining "unjust enrichment," notes that:

> Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to take it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor.

Restatement of Restitution § 1 comment c (1937). Many courts have held that conferring a benefit on an insurer, by working to prevent an even greater loss, is sufficient to allow the court to award recovery to the insured on equitable or public policy grounds. *See, e.g., Bankers Trust Co. v. Hartford Accident and Indemnity Co.,* 518 F.Supp. 371, 374 (S.D.N.Y.), *vacated on other grounds,* 621 F.Supp. 685 (S.D.N.Y. 1981) (defendant liable to plaintiff for costs incurred in correcting pollution problem, even though plaintiff's liability policy did not specifically cover such costs, because defendant received a benefit from the expenditure); *Goodyear Rubber & Supply, Inc. v. Great American Insurance Co.,* 545 F.2d 95, 96 (9th Cir.1976) (payments made to salvors who saved a burning barge

reimbursable on equitable grounds because "it would be a strange kind of justice, and a stranger kind of logic, that would hold the defendant liable for as much as $450,000 if the barge and its contents had been consumed by fire, but free of liability for a much lesser amount because of the fortuity of rescue"); *Globe Indemnity Co. v. State,* 43 Cal.App.3d 745, 118 Cal.Rptr. 75 (1974) (insurer liable for fire suppression costs assessed against plaintiff by State, since suppression prevented further damage to third parties); *Harper v. Pelican Trucking Co.,* 176 So.2d 767 (La.Ct.App.1965) (principles of equity entitled plaintiff to recovery of expenses incurred to save cargo).

The above cases are distinguishable, and therefore not persuasive here, for two principal reasons. First, the insurance policies at issue there were apparently silent on the overall issue of contribution. ICEC's policy specifically provides for contribution through a sue and labor clause, and I have determined that the clause does not cover ICEC's dispute-related expenses. To allow recovery on equitable grounds here would thus make the sue and labor clause meaningless.

Second, ICEC's cargo policy did not provide any type of liability coverage or require American Home to defend a claim against ICEC. In other cases in which equitable relief has been held to be appropriate, the scope of the policy may have been vague, but the expenses incurred were directly related to the type of coverage which the policy provided. ICEC's expenses here arose from a dispute with Dharma that was unrelated to the cargo, the fertilizer, itself. Nor, given the C & F terms of the sales contract, could American Home have reasonably anticipated that it might become involved in a dispute concerning the proper party to bear responsibility for delivering the cargo. In light of these considerations, I decline to impose on American Home the type of coverage for which the parties themselves could have contracted but did not.

I realize that ICEC was originally placed in a difficult position. If it had refused to arbitrate its dispute with Dharma, it ran at least some risk of losing the arbitration, as well as the risk that American Home would claim that ICEC had forfeited any coverage for the costs of the diversion because it had not worked to benefit American Home as required under the sue and labor clause. But American Home advised ICEC to conduct itself as a "prudent uninsured" throughout the dispute, and expressly disclaimed any liability, creating no false expectations on ICEC's part that American Home would ultimately agree to reimburse ICEC. *Compare* Restatement of Restitution § 40(c) (1937) (restitution warranted where person rendering services to another holds mistaken belief that services will be compensated).

## CONCLUSION

For the reasons discussed above, the motion for partial summary judgment is denied.

SO ORDERED.